Express Publishing Company v. Commissioner.
Express Publ. Co. v. Commissioner
Docket No. 112226.
United States Tax Court
1943 Tax Ct. Memo LEXIS 94; 2 T.C.M. (CCH) 859; T.C.M. (RIA) 43440; September 30, 1943
*94 Leroy G. Denman, Esq., 215 W. Commerce St., San Antonio, Tex., for the petitioner. Frank B. Schlosser, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined a deficiency of $2,335.44 in income tax of petitioner for the calendar year 1940. Petitioner contests the deficiency and claims an overpayment of $5,544.67 upon the ground that it is entitled to a net operating loss carry-over from the year 1939. The issues are (1) whether certain amounts paid by petitioner in 1939 and 1940 as salaries to its first and second vice-presidents were deductible as ordinary and necessary expenses under the Revenue Act of 1936, section 23 (a), as amended, [1] and (2) whether petitioner is entitled to deduction of $14,902.09 as a debt which became worthless in 1940, under section 23 (k) of the same act, as amended. [2]
*95 Findings of Fact Petitioner is a Texas corporation located at San Antonio, Texas. Its return for the calendar year 1940 was filed with the collector of internal revenue at Dallas, Texas. Petitioner is engaged in the publication of two newspapers, the San Antonio daily and Sunday Express and the San Antonio Evening News. These are the principal newspapers serving the territory between San Antonio and El Paso, Texas, and San Antonio and the Rio Grande River. Petitioner's newspaper business was organized in 1865. Shortly thereafter Frank Grice became its principal owner and manager. He remained so until his death about 1905, upon which he was succeeded by his widow who published the paper for about five or six years, when she was succeeded by her son-in-law and then by the present president, Frank G. Huntress. Grice and his family built the paper to a position of prestige so that it became the leading newspaper in a large territory. It has a daily circulation of about 71,000 for the daily Express, 76,000 for the Evening News, and 120,000 for the Sunday Express. Its gross income varied from one and one-half million dollars to two million dollars per year, derived principally from advertising, *96 about 75 per cent of which was of a character appealing to women. Its average earnings have been large. After the death of Frank Grice and his widow, the principal surviving member of the Grice family was the widow of Frank Grice, Jr., now Mrs. Carrie Grice Frost. The husband of Mrs. W. Dorsey Brown was vice-president and a director of petitioner at the time of his death in 1925. The officers of petitioner during the taxable years were Frank G. Huntress, president., Mrs. Carrie Grice Frost, first vice-president; Mrs. W. Dorsey Brown, second vice-president; Thornton Hall, secretary, and Frank G. Huntress, Jr., treasurer. Mrs. Frost received a salary of $275 per month and Mrs. Brown received a salary of $175 per month. Both of these individuals were and are also directors of the corporation. The president, Frank G. Huntress, received a salary of $25,000 per year. The secretary, Thornton Hall, received a salary of $5,400 per year. Prior to 1922 Mrs. Frost had been second vice-president of the petitioner. In that year she was elected first vice-president to succeed Thomas H. Franklin, an attorney and a member of the legal firm representing the petitioner. Franklin had received a retainer *97 for legal services of $6,000 per year, together with a salary of $10 per week as first vice-president. His resignation as vice-president in 1922 occurred because he felt it would be in the best interests of petitioner for him not to be an officer and its attorney also, since petitioner's aggressive policy in discussing the conduct of state officials in their enforcement of the law at times resulted in libel suits against both petitioner and its officers. Mrs. Carrie Grice Frost is a woman of intelligence, strong personality and moral courage. She is familiar with the newspaper business and the policies adopted by petitioner and carried out through its history. She was interested in those policies as a member of the Grice family and the public knew that as first vice-president of petitioner she was qualified to take over and perform the duties of president in case of the inability to act on the part of the president, Frank G. Huntress. Her present husband is the chairman of the board of directors of San Antonio's largest bank and her family occupies a prominent position in the social and business world of that section. She does not maintain a personal office in the offices of petitioner *98 but attends all directors' meetings and approximately twice a month comes to petitioner's offices for discussion of matters of business and policy in the operation of its papers. She is subject to call by petitioner. Mrs. W. Dorsey Brown is a sister of Mrs. Frost and the widow of a former director and second vice-president of the petitioner. She was elected to succeed her husband upon his death in 1925. Mrs. Brown is an intelligent woman but not as forceful or able as Mrs. Frost. Her home is in northern Texas several hundred miles from San Antonio. She maintains no business office with petitioner and attends only the monthly meetings of the board of directors and any additional special meetings of the board of which she is notified. During the year 1940 one-third of petitioner's 1,000 shares of outstanding stock was owned by the Brackenridge estate, 248 1/3 shares were owned by Frank G. Huntress and members of his family, 40 shares were owned by the Thomas H. Franklin estate, and the balance of the stock, with the exception of four shares, was owned by Mrs. Frost, Mrs. Brown and other members of the Grice family connection. Of this stock Mrs. Frost owned 114 1/3 shares and Mrs. *99 Brown owned six shares. Petitioner deducted for both tax years as salaries paid for services actually rendered it the "salaries" paid Mrs. Frost and Mrs. Brown as first and second vice-presidents, respectively. Respondent disallowed these deductions. The salary of Mrs. Frost, to the extent of $1,000 for each of the taxable years, was reasonable compensation for the services she actually rendered petitioner during those years and was paid to her for those services. In the year 1939 H. C. Thorman, a prominent real estate operator in San Antonio, was indebted to petitioner on open account in the sum of $14,902.09 which was the balance due for advertising over a period of years. He also owed petitioner the sum of $11,014.93, evidenced by a promissory note. These debts were for advertising in petitioner's papers and the amounts thereof had been accrued as income by petitioner and reported in its returns as such. The note was not charged off but the open account in the amount of $14,902.09 was charged off petitioner's books in 1940 as a bad debt then ascertained to be such and so deducted on its return for that year. Respondent disallowed the deduction. Thorman had advertised in petitioner's *100 papers for many years and had paid his accounts with reasonable promptness until the business depression in 1932. Subsequent to that time his payments were less prompt but he continued to advertise and continued to make payments on account each year, the unpaid balance gradually increasing. Over the years from 1932 to 1940, as the unpaid balance of the open account slowly increased, there was correspondence between Thorman and petitioner with respect to settlement of the unpaid balance. Thorman advised that he was unable to pay in cash but would settle the indebtedness by a conveyance of real estate. Finally, on August 13, 1940, Thorman wrote petitioner again renewing his offer to settle the indebtedness by a conveyance of real estate offering either of two business properties. One, he stated, had cost him $90,000 and was encumbered to the extent of $27,100; the other, he said, he had acquired at a cost of $66,000 and that it was now pledged on a collateral loan but he agreed to secure its release therefrom and to deed it to petitioner free and clear of all encumbrances for his indebtedness to petitioner. It was the policy of petitioner not to accept real estate in payment of indebtedness *101 unless it was impossible to get payment otherwise. Thorman's offer was refused. Petitioner made no investigation to determine the values of the two properties. Subsequent to the charge-off of the open account as a worthless debt petitioner took from Thorman a non-interest-bearing note for approximately $26,000 covering both the open account and the amount due on his note indebtedness. It also entered into an agreement with Thorman under which he was to pay a minimum of $100 per month on this indebtedness and pay his account for future advertising currently by the month. Since that time Thorman has been making these payments on the total indebtedness as evidenced by the new note. Opinion Petitioner contends that the payments designated as salaries paid to Mrs. Frost and Mrs. Brown as its first and second vice-presidents were ordinary and necessary expenses of its busines in that they constituted "a reasonable allowance for salaries * * * for personal services actually rendered * * *" by those ladies during the taxable years. Revenue Act of 1936, section 23, supra, as amended. Respondent argues that these two individuals performed no actual services to the petitioner for which *102 these payments were made, and that they were in the nature of distributions of earnings to stockholders. The payments in controversy do not appear to us to have been indirect dividend distributions, since Mrs. Frost owned 114 1/3 shares and Mrs. Brown six shares of petitioner's total of 1,000 shares of outstanding stock and there were no payments to any other stockholders by way of salary or otherwise that are questioned in any way by respondent. However, to be deductible, the contested expenditures under the pleadings and proof here must have been paid for "personal services actually rendered" to petitioner by these ladies. Petitioner has the burden of proof. Mrs. Brown was not even a resident of San Antonio but lived several hundred miles away. The only actual services she rendered petitioner were those as a director of the company in attending monthly meetings of the board of directors and special meetings of which she was advised. We are not convinced from the evidence that it was intended she should or could do more than this, as was true with Mrs. Frost. Certainly the record does not establish that she was paid any part of her salary for any services she actually performed *103 as second vice-president. Mrs. Frost did actually render services to the petitioner over and above those of a director of the corporation. She resided in San Antonio. She visited petitioner's office for consultation, discussion and determination of business matters and policies of the petitioner about twice a month. Because of her intelligence, experience, ability, moral character and interest as a member of the Grice family in the policies of the paper, she was qualified to take over the direction of petitioner's activities in the case of the absence or disability of the president, Frank G. Huntress, for which she was subject to call. Undoubtedly a part of her salary was paid for these services actually rendered. It may be that these services were worth much to petitioner. We are by no means convinced, however, that the contested salary was paid her only for those services. In fact, a consideration of this record leads us to the conclusion that the bulk of the payments to her designated as salary, as well as all the contested salaries paid Mrs. Brown, were not made for "services actually rendered" by them. That they may have been paid for good will, advertising, or some other proper *104 and commendable purpose is beside the point here. They were not made for the "services actually rendered" by these ladies. See In re Merriam v. United States, 282 Fed. 851, affd., 263 U.S. 179; Winter Realty & Construction Co., 2 T.C. 38. As such, of course, they are not deductible as salaries or compensation. Accordingly, respondent is affirmed in disallowing the deduction of all the contested salary paid to Mrs. Brown. We think this record establishes, however, and have so found, that the salary paid to Mrs. Frost during the taxable years included reasonable compensation of $1,000 in each of the taxable years for "services actually rendered" by her to petitioner as vice-president, and no more. See Cohan v. Commissioner, 39 Fed. (2d) 540, reversing 11 B.T.A. 743. Effect will be given to that finding in the recomputation under Rule 50. Section 124 of the Revenue Act of 1942 amends section 23 (k) of the Internal Revenue Code by, inter alia, providing that the allowance of deductions for bad debts is limited to those which become *105 partially or wholly worthless within the taxable year. This amendment was specifically made retroactive to all taxable years beginning after December 31, 1938. Under such amendment the necessity for ascertainment and charge-off is eliminated and for this is substituted the necessity for establishing that the whole debt, or the portion sought to be deducted as worthless, actually became worthless during the taxable year. Estate of Harris Fahnestock, 2 T.C. 756. We find in the evidence nothing indicating, much less establishing, that the indebtedness here sought to be deducted actually became worthless during the year 1940 and for this reason alone the petitioner would fail on this issue. It is unnecessary, however, to decide the issue upon the ground of lack of proof since there are facts definitely established which convince us that the indebtedness could not be considered as wholly worthless in 1940. In August 1940 the debtor offered to transfer real estate, free and clear of all encumbrance, which had cost him $66,000, in settlement of the indebtedness. There is nothing in the evidence contradicting the presumption that this property had some value. *106 In 1940 the debtor was still in business and a customer of petitioner being given credit and paying his current bills. Moreover, he had given petitioner a note covering his then indebtedness including the amount here in question and was making payments of $100 per month thereon. The open account in dispute was not an old account which covered only transactions in past years. It was an active account on which there were debits and credits through the year 1940. In fact, in that year the account is debited with $1,048.80 and credited with $2,008.80 and the amount actually charged off is the balance as of the close of the year 1939 although the account was open and active following that date. Under these conditions it is apparent to us that this account was not without value in 1940 and the action of respondent in disallowing the deduction is sustained. Decision will be entered under Rule 50. Footnotes
1. INTERNAL REVENUE CODE: SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *. ↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. (As amended by Sec. 124, Revenue Act of 1942). (k) Bad debts. - (1) General rule. - Debts which become worthless within the taxable year; * * *.↩