**Thomas McCAFFREY, Jr., et al.,**
**Petitioners**

**v.**

**COMMISSIONER OF INTERNAL REVENUE.**

**No. 12895.**

United States Court of Appeals
Third Circuit.

Argued Nov. 2, 1959.

Decided Feb. 10, 1960.

Robert G. MacAlister, Pittsburgh, Pa. (Stanley M. Simon, Pittsburgh, Pa., on the brief), for petitioners.

Victor A. Altman, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attys., Department of Justice, Washington, D. C., on the brief), for respondent.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

This petition for review of the Decision of the Tax Court of the United States [1] concerns the applicability of the "nonrecognition of gain" provisions of Section 112(f) of the Internal Revenue Code of 1939, as amended.[2]

The issue presented is whether the Tax Court erred in holding that property acquired by the taxpayer with the proceeds he received from the condemnation of his parking lot property was not "similar or related in service or use" to the condemned property.

The critical facts may be stated as follows:

Thomas McCaffrey, Jr., the petitioner ("taxpayer") [3] has been engaged in the business of industrial realtor and appraiser in and about Pittsburgh, Pennsylvania since 1923. In 1947, he acquired, at a cost of $15,000, a co-ownership interest in a property in Pittsburgh occupied as a parking lot. The lot was 80 by 180 feet. It had on it only a small frame building adaptable for use in the operation of a parking lot. The property was filled, graded and blacktopped. It was served by the usual utilities— water, gas, electricity and telephone. It also had a railroad siding which was unused. In 1923, and for an undisclosed period thereafter prior to 1947, the property was used as a coal yard. Neighboring properties were industrial in nature.

At the time taxpayer acquired his interest in the Pittsburgh property it was under lease as a parking lot. It remained so during the entire period of his co-ownership under annual leases which provided that the property could be used only for parking purposes.

In 1952, the Commonwealth of Pennsylvania condemned the Pittsburgh property and taxpayer was awarded $57,477 —an excess of $42,477 over his $15,000 cost. Subsequently, he sought to acquire an industrial property of similar size in Pittsburgh but was unable to find any "to accommodate my [his] desires". However, he found available, in the City of New Castle, Pennsylvania, about fifty miles from Pittsburgh, a 9⅓ acre tract, industrially zoned, owned by the American Can Company. It had on it a two-story 694 x 80 feet building of brick and wood construction with concrete and wood floors, equipped with elevators, sprinkler and heating systems. It also had an engine room, garages and lumber shed. A part of the tract was surfaced

---

1. The Decision of the Tax Court is reported at 1958, 31 T.C. 505.

2. Section 112 provides in part:
   "§ 112. Recognition of gain or loss—
   "(a) *General rule.* Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.
   \*   \*   \*   \*   \*
   "(f) [as amended by Sec. 1, Act of October 31, 1951, c. 661, 65 Stat. 733] Involuntary Conversion.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—
   "(1) *Conversion into similar property.* Into property similar or related in service or use to the property so converted, no gain shall be recognized.
   \*   \*   \*   \*   \*
   "(3) *Conversion into money where disposition occurred after 1950.* Into money or property not similar or related

   in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:
   "(A) Nonrecognition of Gain. If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock.
   \*  \*  \*" 26 U.S.C. 1952 ed., Sec. 112.

3. Mr. McCaffrey's wife is also a petitioner here, but solely because she filed a joint return with her husband.

with blacktop and cinders and was used for parking purposes by executives, employees and customers of a corporation conducting business on an adjacent property; another part had cinder surfacing for use in parking incidental to unloading shipments by rail on two Baltimore & Ohio sidings which served the property.

Coincident with his learning of the availability of the New Castle property taxpayer also ascertained that the Federal Civil Defense Administration ("Administration") had previously considered leasing it but had not done so because of the physical condition of the buildings. He thereupon entered into negotiations with Administration to lease the property and obtained a lease commitment provided certain repairs, alterations and improvements were made. Taxpayer then negotiated the purchase of the property by the Arsenal Corporation, a Pennsylvania corporation, from the American Can Company at a price of $155,000, of which $105,000 was represented by a mortgage on the property to the American Can Company. Thereafter, in August, 1953, taxpayer purchased all of the stock of the Arsenal Corporation for $64,029. At the time the New Castle property was the Arsenal's sole asset. Subsequently, Arsenal leased the New Castle property to Administration on a year-to-year basis for use for warehouse purposes and expended approximately $100,000 in making the repairs and improvements called for by the lease commitment. The rental paid by Administration did not include any amount as a charge for its use of the property for parking purposes.

In determining the tax deficiency in issue, the Commissioner determined that taxpayer was not entitled to the benefits of the "nonrecognition of gain" provisions of Section 112(f), and, accordingly that the gain of $42,477 realized from the condemnation of taxpayer's interest in the Pittsburgh property constituted long-term capital gain taxable in 1953. The Tax Court agreed on the ground that the New Castle property, acquired by taxpayer through stock ownership of the Arsenal Corporation, was not property "similar or related in service or use" to the Pittsburgh property within the meaning of Section 112(f). This petition for review followed.

The sum of taxpayer's contention here is that he "is in the business of investing in industrial real estate for the purpose of producing income therefrom" and since "both the condemned property and the replacement property were industrial properties which served the same function, use and purpose" to him, to wit, "producing rental income therefrom" that the purchased property is "similar or related in service or use" to the one converted within the meaning of Section 112(f).

There are then two arrows in the quiver of taxpayer's contention: (1) it is the "service or use" to which he put his money for the production of rental income in the two properties involved, rather than the "service or use" which the properties were designed to afford, or their physical characteristics, which is dispositive; and (2) the two properties were in fact similar in "service or use" in that they are both "industrial properties".

The Tax Court erred, says the taxpayer, in disregarding the factors stated, and applying instead a "functional test" to establish whether the Pittsburgh and New Castle properties were "similar or related in service or use", viz., the "purpose" or nature of the properties themselves.

We do not subscribe to taxpayer's contention that the nonrecognition of gain provisions of Section 112(f) are available to him simply because both properties were used by him for the same "use"—the production of rental income. Nor do we agree with him that the two properties are "industrial" and thus "similar or related in service or use" within the meaning of the statute.

The fact that taxpayer "used" the money invested in the old and new properties for the similar purpose of producing rental income does not bring into

play the nonrecognition of gain provisions of Section 112(f), and is impertinent to its application.

The statute provides in two separate sub-sections that in order to qualify for its nonrecognition of gain relief there must be a "conversion into similar property" and "similar property" is defined as "similar or related in service or use to the property so converted". The sub-sections referred to are (f) (1) and (f) (3) (A).

Sub-section (f) (1) provides in part:

"*Conversion into similar property.* Into property similar or related in service or use to the property so converted * * *."

Sub-section (f) (3) (A) provides in part:

"Nonrecognition of Gain. If the taxpayer during period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases *other property similar or related in service or use to the property so converted * * *"* (Emphasis supplied).

Section 112(f) is not concerned with "why" taxpayer invests the proceeds of the converted property, but only "how" he does so, viz., into "similar or related in service or use" property.

That brings us to consideration of taxpayer's contention that the Pittsburgh and New Castle properties are "similar" because, he says, they are both "industrial".

We cannot subscribe to this contention.

First, we do not think that the Pittsburgh parking lot property can be considered "industrial" because the word "industrial" in its accepted connotation denotes "the processes or products of manufacture, or commercial production in general".[4] By no stretch of the imagination can the use of a lot for the public parking of cars be considered an "industrial" use. On the other hand, the New Castle property, in its state prior to its acquisition by taxpayer and subsequent thereto, was within the classification of "industrial" property.

We next consider the question as to whether the Pittsburgh and New Castle properties were otherwise "similar or related in service or use".

Taking first the Pittsburgh property:

It was 80 x 180 feet in size, filled, graded and blacktopped, and had on it "a small frame building which was adaptable for use only in the operation of a parking lot".[5] The property had been leased and used for public parking prior to taxpayer's acquisition of an interest in it in 1947; it continued so under his ownership for some five years until the condemnation in 1952. There is not even a contention that taxpayer prior to the condemnation had planned to change the physical character of the Pittsburgh property or its use. Thus, the conclusion is inescapable that the "service or use" of this property was as a public parking lot and that only.

As to the New Castle property:

It was more than nine acres in size and had erected on it these structures: a two-story building, 694 x 80 feet in dimension, equipped with elevators, sprinkler and heating systems; an engine room building, garages and lumber shed. While an undisclosed portion of the property was surfaced with blacktop and cinder and was used for parking purposes by an adjacent factory, it is clear that this was not merely a "parking lot" property. It may be noted, parenthetically, that the parking by the adjacent factory ceased after taxpayer's acquisition and the entire tract was "fenced-in". Further, while the record does not disclose whether the American Can Company used the property for warehousing purposes during its ownership or occupancy, the record establishes that taxpayer (via Arsenal Corporation) leased the property to the Civil Defense Administration solely for warehouse purposes and further that $100,000 was expended in making repairs, alterations

---

4. Funk & Wagnalls, New Standard Dictionary of the English Language.

5. As stipulated by the parties.

and improvements to the property to make it usable for such purposes. Indeed, taxpayer did not (via Arsenal) buy the New Castle property until he had obtained a commitment for its rental to the Administration as a "warehouse".

In summary, then, the Pittsburgh property was suitable and used for public parking lot purposes and the New Castle property was suitable and used for warehouse purposes. Clearly they were not "similar" properties, physically or otherwise, nor were they "similar or related in service or use".

It would serve no useful purpose to review the numerous cases in which the courts have dealt with "nonrecognition of gain" since in each instance they were decided on their particular facts, except with respect to Steuart Brothers, Inc. v. Commissioner, 4 Cir., 1958, 261 F.2d 580 on which taxpayer premises his contention.

In Steuart the converted real estate was held for rental purposes and the proceeds of the condemnation were reinvested in real estate so as to produce rental income.[6] The Fourth Circuit

6. In Steuart Brothers, Inc. v. Commissioner, taxpayer, a corporation, was engaged in the business of acquiring improved and unimproved realty for investment purposes. In 1948 it purchased a four and one-half acre tract of commercially zoned land in Washington and subsequently planned to improve the land with two warehouse properties and negotiated their leasing to two different parties. It was, however, unable to proceed with construction because of the imminence of condemnation proceedings which did in fact ensue. The proceeds of the condemnation were used by the taxpayer to acquire three properties. One of the properties was occupied in part by a one-story building used as automobile salesrooms, garage and service station and the remainder used as a parking and used car lot. The entire property was under a lease to an automobile dealer. The second property was improved in part with two one-story buildings used as automobile showrooms, automotive repair shop, garage and service station and the remainder as a parking and used car lot. This property, too, was leased to an automobile dealer. The third property was improved with a two-story building used as a service station prior to taxpayer's purchase and subsequent to it by the operator of a fleet of taxicabs.

In deciding that the condemned tract was of the "same general class" and therefore similar within the meaning of Section 112(f) to the three properties which replaced it, the Court said at pages 582-583:

" * * * The taxpayer's vacant land * * * had been definitely committed by contract to specific uses, which should be compared with the uses to which the land purchased with the proceeds of the condemnation award was actually devoted. Two buildings were designed for the original tract: (1) a one-story building to be leased to and used by a retail grocery store, and (2) a one-story warehouse to be leased to the Manor Real Estate and Trust Company. The new properties were devoted generally to usages of the automobile business, the Rhode Island and Third Street properties were automobile showroom, repair shop, garage-service station, and parking lot by an automobile dealer; the Fourteenth Street property as a service station by the operator of a fleet of taxicabs. A comparison between these uses would be relevant if the taxpayer itself had used or intended to use the original land for the planned purposes and later, after the condemnation, had itself used the new land in the same way as its tenants used it. But the taxpayer was not in possession and did not itself actually use the newly acquired properties for any purpose. It held them for an investment exactly as it had previously held the condemned properties; and it is manifest that the purpose of the statute will be served if the taxpayer is not compelled at this time to recognize the gain which it was compelled to realize by the condemning power."

And at page 584:

"The Tax Court cites a number of decisions in which it found that the required similarity of use did not exist; but in these cases the use of the property by the taxpayer itself before the involuntary conversion took place was compared with the use of the new property by the taxpayer itself thereafter. There was no comparison of investments in real estate held by the taxpayer before and after the conversion, but not used by the taxpayer itself. In our view the taxpayer * * * is entitled to the benefit of the statute because the original real estate was held by it for investment purposes and the proceeds of the condemnation were reinvested in real estate of the same general class."

granted nonrecognition of gain on its holding that (at page 584):

> "In our view the taxpayer * * * is entitled to the benefit of the statute because the original real estate was held by it for investment purposes and the proceeds of the condemnation were reinvested in real estate of the same general class".

In doing so it drew a distinction between situations where the taxpayer had himself used both the converted property and its replacement and those where both the old and new properties were held by the taxpayer for investment purposes and not "used" by him. It indicated that the "functional test" applied in the first instance but not in the second, and that in the latter the test was simply whether the two properties were in "the same general class".

The Court's finding in Steuart that there the converted real estate and its replacement were "of the same general class" is of course an ultimate finding of fact with which we are not here concerned, although as fact-finders often do, we might have arrived at an opposite determination on the score of such classification. Insofar however, as the test of classification was motivated by the Court's view that different standards are to be applied in such classification because of the status of the owners of the propertes—investors versus users— we must say that we cannot discern in Section 112(f) any basis for the application of varying standards in determining whether there has been a "conversion into similar property" or whether the replacement property is "similar or related in service or use to the property so converted".

There remains for consideration the Commissioner's contention that the Pittsburgh property was "unimproved" whereas the New Castle property was "improved" thus calling into play the provisions of Treasury Regulations 118, Sec. 39.112(f)–1(c) (9) which state:

> "There is no investment in property similar in character and devoted to a similar use if—
>
> "(i) The proceeds of unimproved real estate, taken upon condemnation proceedings, are invested in improved real estate".

In support of his contention that the parking lot is "unimproved" property Commissioner cites Feist v. Fifth Avenue Bank, 1939, 280 N.Y. 189, 20 N.E. 2d 388, 389, where it was held that "improved" real estate is " * * * land which * * * is substantially enhanced in value by some probably durable structural improvement".

We deem it unnecessary here to consider this contention because of our view that the Pittsburgh and New Castle properties were not similar or related in service or use within the meaning of Section 112(f), irrespective of the question as to whether the Pittsburgh property was "improved" or "unimproved".

For the reasons stated the Decision of the Tax Court will be affirmed.