*Decision will be entered under Rule 50.*

LIANT RECORD, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 72955, 83431–83433. Filed April 28, 1961.

*Harry J. Winick, Esq.*, for the petitioners.
*Robert S. Bevan, Esq.*, for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: William I. Alpert and Paula G. Alpert, Docket No. 83431; Abraham Alpert and Sarah Alpert, Docket No. 83432; Jack L. Alpert, Docket No. 83433.

ATKINS, *Judge:* The respondent determined deficiencies in income tax against the petitioners for the calendar year 1955, as follows:

| Docket No. | Amount |
| --- | --- |
| 72955 | $15, 561. 02 |
| 83431 | 31, 492. 43 |
| 83432 | 30, 352. 69 |
| 83433 | 30, 310. 37 |

The only issue presented is whether the petitioners reinvested the proceeds received by them from the condemnation of property in property similar or related in service or use to the property condemned within the meaning of section 1033(a) of the Internal Revenue Code of 1954.

### FINDINGS OF FACT.

Some of the facts have been stipulated and such stipulated facts are incorporated herein by this reference.

The petitioner Liant Record, Inc., hereinafter referred to as Liant, is a corporation organized and existing under the laws of the State of New York with its principal office in Brooklyn, New York. It keeps its books and prepares its income tax returns on a calendar year basis and on an accrual method of accounting.

The petitioners, William I. Alpert and Paula G. Alpert, are husband and wife, and the petitioners, Abraham and Sarah Alpert, are husband and wife, all residing at Long Beach, New York. Paula and Sarah Alpert are petitioners solely because they filed joint returns with their husbands for the calendar year 1955. Jack L. Alpert is an individual who formerly resided in Brooklyn, New York. The returns of all the petitioners were filed with the district director of internal revenue at 210 Livingston Street, Brooklyn, New York. The returns of the individuals were on the cash method of accounting.

The petitioners, William, Abraham, and Jack Alpert are brothers. They are investors in income-producing real property. They, together with Liant and Norman Eisenstein, were stockholders of a corporation known as Reliant Realty Co., Inc. On April 23, 1953, Reliant Realty Co., Inc., was liquidated and its stockholders acquired the ownership of real property known as 1819 Broadway, in the Borough of Manhattan, City of New York. The undivided interest and ownership of each of the coowners in the 1819 Broadway property was as follows:

| | Percent |
| --- | --- |
| William | 16⅔ |
| Abraham | 16⅔ |
| Jack | 16⅔ |
| Liant | 8. 7 |
| Norman Eisenstein | 41. 3 |

The adjusted bases of the coowners in such property on November 17, 1953, were as follows:

| | |
|---|---:|
| William | $313, 222. 27 |
| Abraham | 313, 222. 27 |
| Jack | 313, 222. 28 |
| Liant | 163, 502. 03 |
| | 1, 103, 168. 85 |
| Eisenstein | 776, 164. 79 |
| Total | 1, 879, 333. 64 |

On November 17, 1953, the City of New York instituted condemnation proceedings against the 1819 Broadway property and acquired title on the same date. William, Abraham, and Jack Alpert and Liant received the following amounts in full settlement for the condemned property during the years indicated:

| | 1954 | 1955 | Total |
|---|---:|---:|---:|
| William | $201, 875. 00 | $232, 588. 78 | $434, 463. 78 |
| Abraham | 201, 875. 00 | 232, 588. 78 | 434, 463. 78 |
| Jack | 201, 875. 00 | 232, 588. 77 | 434. 463. 77 |
| Liant | 105, 378. 75 | 121, 411. 38 | 226, 790. 13 |

On July 12, 1955, William, Abraham, and Jack Alpert and Liant acquired property located at 55 West 11th Street, New York City, at a total cost of $545,701.50, the ownership being divided as follows:

| | Percent |
|---|---:|
| Liant | 50 |
| William | 16⅔ |
| Abraham | 16⅔ |
| Jack | 16⅔ |

On November 1, 1956, William, Abraham, and Jack, in equal cotenancy, acquired property located at 400 East 50th Street, New York City, at a total cost of $312,500, and property located at 35 East 84th Street, New York City, at a total cost of $748,000.

The aliquot shares of the properties acquired by the petitioners during 1955 and 1956 are summarized as follows:

By Liant:
| | |
|---|---:|
| ½ of 55 West 11th Street (½ of $545,701.50) | $272, 850. 75 |

By William:
| | |
|---|---:|
| ⅙ of 55 West 11th Street (⅙ of $545,701.50) | 90, 950. 25 |
| ⅓ of 400 East 50th Street (⅓ of $312,500) | 104, 166. 66 |
| ⅓ of 35 East 84th Street (⅓ of $748,000) | 249, 333. 34 |
| | 444, 450. 25 |

By Abraham:
| | |
|---|---:|
| Identical with William | 444, 450. 25 |

By Jack:
| | |
|---|---:|
| Identical with William | 444, 450. 25 |

The real property at 1819 Broadway consisted of a plot of land, 80 feet by 100 feet, on which was located a 25-story steel-frame building which had been erected about 1913, with a basement and subbasement. On November 17, 1953, it was rented to 82 tenants who used it to conduct business exclusively. The ground floor was occupied by a bank. The upper floors were occupied by various commercial tenants, including accountants, attorneys, real estate firms, and a doctor and a dentist. None of the petitioners used or occupied any part of this property.

The premises located at 55 West 11th Street consisted of a plot of land, 96 feet by 103 feet, and a 9-story penthouse brick building containing 82 apartments and 4 rooms for maids. The building was principally an apartment house, and most of the apartments were leased by the petitioners to tenants for residential purposes. On July 12, 1955, 77 were used for residential purposes. (Five were used for commercial purposes, including two physicians' offices, one to an export and import business office, and one as an office for economic research.) Three of the maids' rooms were used as a real estate office. None of the petitioners ever used or occupied this building.

The premises located at 400 East 50th Street consisted of a plot of land, 60 feet by 90 feet, and a 6-story brick building containing 47 apartments. The building was principally an apartment house and all of the 47 apartments were leased unfurnished by William, Abraham, and Jack Alpert to tenants for residential purposes. In addition, on November 1, 1956, there was a restaurant, a stationery store, a tailor shop, and a supermarket. The petitioners did not use or occupy the premises.

The premises located at 35 East 84th Street consisted of a plot of land, 125 feet by 102 feet, and an 11-story steel-frame building and penthouse, containing 46 apartments and 6 rooms for maids. Of the latter, only one was used as a maid's room in November 1956. This building was principally an apartment house, and most of the apartments were leased unfurnished by William, Abraham, and Jack Alpert to tenants for residential purposes. On November 1, 1956, 40 of the apartments were rented for residential purposes and 6 for commercial purposes, being used as offices by physicians and dentists. There was a valet shop in the basement. This property is in a predominantly residential neighborhood, but was zoned, and could be used, for commercial purposes. None of the petitioners used or occupied these premises.

All the apartments contained in the premises at 55 West 11th Street, 400 East 50th Street, and 35 East 84th Street were typical residential apartments having fully equipped bathrooms and kitchens.

None of the petitioners included in his or its income tax return for the year 1955 any part of the gain derived upon the disposition of the property at 1819 Broadway.

In the notice of deficiency the respondent determined that the petitioners had long-term capital gains upon disposition of the property at 1819 Broadway as follows:

| | |
|---|---|
| Liant | $63,288.10 |
| William Alpert | 121,241.51 |
| Abraham Alpert | 121,241.51 |
| Jack Alpert | 121,241.49 |

He accordingly increased the income reported by Liant by $63,288.10. In the case of the individuals he allowed a 50 percent deduction as provided in section 1202 of the Internal Revenue Code of 1954, resulting in an increase in reported income as follows:

| | |
|---|---|
| William Alpert | $60,620.76 |
| Abraham Alpert | 60,620.76 |
| Jack Alpert | 60,620.74 |

In the notice of deficiency addressed to Liant, the respondent specifically determined that the profit realized on the involuntary conversion of the property at 1819 Broadway is taxable "inasmuch as the replacement property is not deemed to be similar or related in service or use in accordance with the requirements of section 1033 of the Internal Revenue Code of 1954," and in the case of the individuals he in effect so determined.

#### OPINION.

The petitioners contend that no gain is to be recognized upon the compulsory or involuntary conversion of the property at 1819 Broadway, since they used the proceeds from such conversion to replace the property converted by purchasing other property "similar or related in service or use to the property so converted" within the meaning of section 1033(a)(3)(A) of the Internal Revenue Code of 1954.[1] They

---

[1] Sec. 1033. (a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. \* \* \*

take the position that in interpreting the term "similar or related in service or use" a subjective test is to be applied and that the determinative factor is the purpose for which the taxpayer holds the converted property as compared with the purpose for which the replacement property was acquired by the taxpayer. They point out that they were investors in income-producing real property and that since both the property converted and the property purchased were income-producing real property, each producing rent, the properties purchased should be deemed to be similar or related in service or use, insofar as they were concerned, to the property converted. They recognize that there must be some similarity between the converted property and the purchased property, but apparently contend that there is similarity in that the converted property and the purchased properties were multistoried buildings dedicated to multitenant occupancy, and that it is immaterial that the converted property was an office building devoted to commercial use by the tenants, whereas the purchased properties were apartment houses, used almost entirely as residences.

The respondent, on the other hand, contends that the test to be applied in determining whether the converted property and the replacement properties are similar or related in service or use is a functional one.[2] He takes the position that the mere fact that income-producing real property is replaced with other income-producing real property does not satisfy the test of the statute where, as here, the use to which the replacement property is put by the tenants is a residential use, whereas the use to which the tenants put the converted property was a commercial use.

A similar question was presented to us, under section 112(f) of the Internal Revenue Code of 1939, in *Steuart Brothers, Inc.*, 29 T.C. 372. There the taxpayer was in the business of acquiring improved and unimproved realty for income-producing purposes and substantially all its income was from the rental of the investment properties. Certain property on which it had planned to erect warehouses for rental was condemned and the proceeds from the condemnation were reinvested in income-producing properties, which at the time of purchase were improved with garages, service stations, and automobile salesrooms. We there held that there was not sufficient similarity or relation in service or use to the converted property to entitle the tax-

---

[2] Section 1.1033(a)–2(c)(9) of the Income Tax Regulations, T.D. 6222, 1957–1 C.B. 248, provides:

(9) There is no investment in property similar in character and devoted to a similar use if—

   (i) The proceeds of unimproved real estate, taken upon condemnation proceedings, are invested in improved real estate.

   (ii) The proceeds of conversion of real property are applied in reduction of indebtedness previously incurred in the purchase of a leasehold.

   (iii) The owner of a requisitioned tug uses the proceeds to buy barges.

payer to nonrecognition of gain. We specifically held that the similarity or relationship in service or use required by the statute is not met by the mere fact that both properties were held for the purpose of producing income by rent. We there stated:

In the instant case, even assuming that the warehouses had been built on the original property, there would have been no functional similarity or relation in use to service stations, garages, and parking lots. While the nature of a taxpayer's business might be important under different circumstances, here it aids petitioner only in showing that the type of profit it intended to derive from the condemned land and the new properties was the same. * * *

Petitioner points out that the statute, since it is a relief provision intended to prevent an unfair incidence of taxation, has been liberally construed by this Court. *Massillon-Cleveland-Akron Sign Co.*, 15 T.C. 79 (1950). Exact duplication of the converted property is not required. Nevertheless, we have adhered to what has been referred to as a "functional" test and we see no reason in departing from this construction of the statute. *Lynchburg National Bank & Trust Co., supra; Kimbell-Diamond Milling Co.*, 10 T.C. 7 (1948); *Davis Regulator Co.*, 36 B.T.A. 437 (1937); *M. J. Caldbeck Corporation*, 36 B.T.A. 452 (1937). As was said in *Lynchburg National Bank & Trust Co. v. Commissioner*, 208 F. 2d 757, 758:

"To hold otherwise would be to say that the replacement of one commercial building by another commercial building is sufficient under the statute to avoid the recognition of gain, no matter how dissimilar or unrelated their respective purposes may be, and we do not think that the statute has that meaning."

This being the case, the statutory test is not necessarily satisfied by a mere replacement of one parcel of income-producing real property with another, for in such a replacement, the function of the old and new properties would not necessarily be similar or related. To hold such replacement sufficient per se would be to eliminate any meaningful requirement of similarity or relation in service or use, whether or not the particular taxpayer be in the business of holding rental property.

That case was reversed on appeal by the Court of Appeals for the Fourth Circuit, 261 F. 2d 580, the court stating in part:

A comparison between these uses would be relevant if the taxpayer itself had used or intended to use the original land for the planned purposes and later, after the condemnation, had itself used the new land in the same way as its tenants used it. But the taxpayer was not in possession and did not itself actually use the newly acquired properties for any purpose. It held them for an investment exactly as it had previously held the condemned properties; and it is manifest that the purpose of the statute will be served if the taxpayer is not compelled at this time to recognize the gain which it was compelled to realize by the condemning power.

*       *       *       *       *       *       *

* * * In our view the taxpayer in the present case is entitled to the benefit of the statute because the original real estate was held by it for investment purposes and the proceeds of the condemnation were reinvested in real estate of the same general class.

The Court of Appeals distinguished its prior decision in *Lynchburg National Bank & Trust Co. v. Commissioner*, 208 F. 2d 757, by stating:

Before the fire and the demolition of the original building the property served as an investment of the bank and was used by the bank's tenants for a shoe store

and a restaurant, while afterwards it was used by the bank itself as its place of business. * * *

In *Thomas McCaffrey, Jr.*, 31 T.C. 505, the taxpayer had real property located in a downtown industrial section of Pittsburgh which it leased to a tenant who used it for parking purposes. After condemnation of such property, the taxpayer used the proceeds to purchase stock of a corporation which owned real property situated in the industrial section of New Castle, Pennsylvania, and which the corporation leased to the Federal Civil Defense Administration for use for warehouse purposes. We there held that there was not sufficient similarity or relation in service or use of the corporation's property to the petitioner's converted property to entitle petitioner to the nonrecognition of gain under section 112(f) of the Internal Revenue Code of 1939. We there reiterated the view that the test applicable in determining whether properties are "similar or related in service or use" is a "functional" test stating:

the statutory test is not necessarily satisfied by a mere replacement of one industrial property with another or by a mere replacement of one rental property with another because in such replacements the function of the old and the new properties would not necessarily be similar or related in service or use.

Upon appeal our decision in that case was affirmed by the Court of Appeals for the Third Circuit, 275 F. 2d 27, certiorari denied 363 U.S. 828. In its opinion the court stated:

The sum of taxpayer's contention here is that he "is in the business of investing in industrial real estate for the purpose of producing income therefrom" and since "both the condemned property and the replacement property were industrial properties which served the same function, use and purpose" to him, to wit, "producing rental income therefrom" that the purchased property is "similar or related in service or use" to the one converted within the meaning of Section 112(f).

There are then two arrows in the quiver of taxpayer's contention: (1) it is the "service or use" to which he put his money for the production of rental income in the two properties involved, rather than the "service or use" which the properties were designed to afford, or their physical characteristics, which is dispositive; and (2) the two properties were in fact similar in "service or use" in that they are both "industrial properties."

The Tax Court erred, says the taxpayer, in disregarding the factors stated, and applying instead a "functional test" to establish whether the Pittsburgh and New Castle properties were "similar or related in service or use," viz., the "purpose" or nature of the properties themselves.

We do not subscribe to taxpayer's contention that the nonrecognition of gain provisions of Section 112(f) are available to him simply because both properties were used by him for the same "use"—the production of rental income. * * *

   \*      \*      \*      \*      \*      \*      \*

Section 112(f) is not concerned with "why" taxpayer invests the proceeds of the converted property, but only "how" he does so, viz., into "similar or related in service or use" property.

The Court of Appeals for the Third Circuit stated as follows with respect to the action of the Court of Appeals for the Fourth Circuit

in granting nonrecognition of gain in *Steuart Brothers, Inc.* v. *Commissioner, supra:*

In doing so it drew a distinction between situations where the taxpayer had himself used both the converted property and its replacement and those where both the old and new properties were held by the taxpayer for investment purposes and not "used" by him. It indicated that the "functional test" applied in the first instance but not in the second, and that in the latter the test was simply whether the two properties were in "the same general class".

The Court's finding in Steuart that there the converted real estate and its replacement were "of the same general class" is of course an ultimate finding of fact with which we are not here concerned, although as fact-finders often do, we might have arrived at an opposite determination on the score of such classification. Insofar however, as the test of classification was motivated by the Court's view that different standards are to be applied in such classification because of the status of the owners of the properties—investors versus users— we must say that we cannot discern in Section 112(f) any basis for the application of varying standards in determining whether there has been a "conversion to similar property" or whether the replacement property is "similar or related in service or use to the property so converted."

It thus appears that the Court of Appeals for the Third Circuit and the Court of Appeals for the Fourth Circuit are diametrically opposed upon the basic question of whether the "functional test" is to be applied in determining whether there has been a replacement of property "similar or related in service or use" in cases where the taxpayer did not itself "use" either the converted property or the purchased property, but held both properties for investment. The Court of Appeals for the Fourth Circuit indicated that in such a case nonrecognition is authorized by the statute if the two properties are in "the same general class." The petitioners herein recognize this conflict and urge us to reconsider our prior position and follow the opinion of the Court of Appeals for the Fourth Circuit in the *Steuart* case.

We have again carefully considered this basic question and, with due respect for the opinion of the Court of Appeals for the Fourth Circuit, we believe the proper view is that taken by the Court of Appeals for the Third Circuit in the *McCaffrey* case, which accords with the view previously taken by us.

A reference to the legislative history of section 1033(a) and its predecessors does not conclusively show the precise intent which Congress had in mind, although in our opinion it tends to support the view that Congress had in mind primarily the character of the property itself. It was in section 214(a)(12) and section 234(a)(14) of the Revenue Act of 1921 that Congress first incorporated a relief provision in the case of involuntary conversion of property. It was there provided that if the proceeds from the conversion were expended in the acquisition of other property "of a character similar or related in service or use to the property converted," then there should be al-

lowed as a deduction such portion of the gain derived as the portion of the proceeds so expended bore to the entire proceeds. In both the report of the Committee on Ways and Means and the report of the Committee on Finance with respect to the Revenue Bill of 1921 (H. Rept. No. 350 and S. Rept. No. 275, 67th Cong., 1st Sess.), the committees refer to the "acquisition of similar property."

By section 203(a)(5) of the Revenue Act of 1924, the type of relief granted was by way of nonrecognition of gain, rather than a deduction, and the words "of a character" were eliminated. However, apparently no significance is to be attached to the elimination of such words, since the congressional committee reports [3] with respect to the Revenue Bill of 1924 make no mention thereof.

It was not until the enactment of section 46 of the Technical Amendments Act of 1958 that Congress added subsection (g) to section 1033 to provide that for purposes of subsection (a), if real property held for productive use in trade or business or for investment is involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted. Subsection (g) provides that it shall apply with respect to the involuntary conversion of any real property only if the disposition of the converted property occurs after December 31, 1957. This subsequent enactment, and the congressional committee reports with respect thereto, while not decisive, may properly be taken into consideration in interpreting the meaning of prior law. *American Exchange Securities Corporation* v. *Helvering*, 74 F. 2d 213 (C.A. 2). The Senate Finance Committee Report [4] with respect to the addition, by

---

[3] H. Rept. No. 179, 68th Cong., 1st Sess., and S. Rept. No. 398, 68th Cong., 1st Sess.

[4] S. Rept. No. 1983, 85th Cong., 2d Sess., relating to the bill which became the Technical Amendments Act of 1958, states as follows with respect to the new subsection (g) of section 1033:

"The Internal Revenue Service and courts have held that section 1033 requires a relatively narrow construction of the words 'property similar or related in service or use,' with the result that the converted property must be substantially similar to that destroyed. It has been held not to include, for example, improved real estate which is converted into unimproved realty, nor a barge substituted for a tug. Similarly, it has been held not to include property used in the operation of a business which was substituted for rented property. Likewise, it has been held not to include city real estate exchanged for a farm or a ranch.

"Present law also provides (sec. 1031) for the nonrecognition of gain where property held for productive use in trade or business or for investment (not including inventory, stock, bonds, or other securities) is exchanged for property of a 'like kind' to be held either for productive use in trade or business or for investment.' The phrase 'like kind to be held either for productive use in trade or business or for investment' has been given a broader interpretation than the similar or related phrase. 'Like kind,' for example, has been held to include unimproved real estate which is exchanged for improved real estate, so long as both properties are held either for productive use in trade or business or for investment. Thus, the 'like kind' phrase has been held to include the exchange of city real estate (used in a trade or business) for a farm or ranch.

"Both in the case of property involuntarily converted and in the case of the exchange of property held for productive use in trade or business or for investment, gain is not recognized because of the continuity of the investment. Your committee sees no reason why substantially similar rules should not be followed in determining what constitutes a continuity of investment in these two types of situations where there is a condemnation

the Technical Amendments Act of 1958, of subsection (g) to section 1033, seems to indicate that Congress intended to amend the existing law, rather than to clarify or interpret it.

The respondent, prior to the Technical Amendments Act of 1958, consistently took the position administratively that the mere fact that the property converted and the property purchased in replacement were both held as investment for the production of income does not satisfy the requirement that the property purchased be "property similar or related in service or use" to the property taken. See G.C.M. 14693, XIV–1 C.B. 197 [5]; Rev. Rul. 56–347, 1956–2 C.B. 517; and Rev. Rul. 58–245, 1958–1 C.B. 274.

After reconsideration of the problem in the light of the opinions of the Courts of Appeals in the *Steuart* and *McCaffrey* cases, we are of the opinion that the correct view of the intendment of the statutory provision in question is that set forth in our opinions in the *Steuart* and *McCaffrey* cases and in the opinion of the Court of Appeals in the *McCaffrey* case, and we adhere thereto.

On brief the petitioners and the respondent have discussed *Winter Realty & Const. Co.* v. *Commissioner*, 149 F. 2d 567 (C.A. 2), certiorari denied 326 U.S. 754, which affirmed and reversed in part 2 T.C. 38. The petitioners insist that in the *Steuart* case we erroneously cited that case for the proposition that something more

of real property. Moreover, it appears particularly unfortunate that present law requires a closer identity of the destroyed and converted property where the exchange is beyond the control of the taxpayer than that which is applied in the case of the voluntary exchange of business property.

"As a result your committee has added a new subsection to the involuntary conversion (sec. 1033) provision of present law. In this new subsection it has added the 'like kind' test of the voluntary exchange of business property rule of present law as an alternative in the case of involuntary conversions for the rule requiring the substitution of property 'similar or related in service or use.' The 'like kind' rule in this case applies, however, only in the case of real property * * *. This new rule is to be available only in the case of the disposition of converted property after December 31, 1957."

[5] In GCM 14693 it was held that the property purchased, bonds and a savings account, was not "property similar or related in service or use" to the property converted, income-producing real property. The ruling states in part as follows:

"the taxpayer contends that since the real property condemned was used to produce income or for investment purposes and the money received was invested in income-producing personal property, the money was 'expended in the acquisition of other property similar or related in service or use to the property so converted' within the meaning of section 112(f), supra. Without entering into a lengthy discussion of this point, it is the opinion of this office that the contention of the taxpayer is without merit. It seems clear that if a person involuntarily converts income-producing real estate into cash which is expended for interest-bearing securities and a savings account, the property acquired may not properly be said to be 'similar or related in service or use' to the real property. It is true that both classes of property are used to produce income, but if that general principle were sufficient to bring such a case within section 112(f), the profit derived upon involuntary sales of property would escape taxation in many instances merely because of reinvestment of the proceeds in totally dissimilar property which produces income. The mere fact that the property disposed of and the property acquired are used to produce income clearly does not justify exemption from taxation under section 112(f), which is an exception to the general rule prescribed by section 112(a) of the Revenue Act of 1928 that the gain derived or loss sustained upon the sale or exchange of property shall be recognized. (See generally article 579, Regulations 74; L.O. 914, C.B. 1, 77; I.T. 1378, C.B. I–2, 26; and I.T. 1617, C.B. II–1, 119.)"

than the fact that both properties were investment properties is required. While the *Winter* case was decided principally upon the ground that the taxpayer had not obtained permission of the respondent to set up a replacement fund, the Court of Appeals did point out that the taxpayer would be entitled to nonrecognition only if it purchased "similar property" and that money lent on mortgage is not the equivalent of real property.

There remains to be considered whether under the "functional test" the properties purchased by the petitioners to replace the property converted constituted "other property similar or related in service or use to the property so converted." The converted property was a 25-story steel-frame building, occupied by 82 commercial tenants, including a bank, a doctor, a dentist, accountants, attorneys, and real estate firms. The properties purchased in replacement thereof consisted of 3 residential apartment buildings containing a total of 175 apartments, only 11 of which were used by tenants for commercial purposes, although in one of them there was a restaurant, a stationery store, a tailor shop, and a supermarket and one had a valet shop in the basement. It seems clear, therefore, that the properties purchased were not "property similar or related in service or use" to the property converted.

In view of the foregoing we hold that the respondent did not err in recognizing the gain derived upon the disposition of the property at 1819 Broadway.

*Decisions will be entered for the respondent.*