Liant Record, Inc. v. Commissioner. William I. Alpert and Paula G. Alpert v. Commissioner. Abraham Alpert and Sarah Alpert v. Commissioner. Jack L. Alpert v. Commissioner.
Liant Record, Inc. v. Commissioner
Docket Nos. 72955, 83431-83433.
United States Tax Court
T.C. Memo 1963-53; 1963 Tax Ct. Memo LEXIS 292; 22 T.C.M. (CCH) 203; T.C.M. (RIA) 63053; February 21, 1963
Bernard J. Long, Esq., and A. J. Schiffer, Esq., 570 Seventh Ave., New York 18, N. Y. for the petitioners. Gerald Robinson, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: This proceeding is before us on mandate from the United States Court of Appeals for the Second Circuit, issued pursuant to that court's opinion in Liant Record, Inc. v. Commissioner, 303 F. 2d 326. In Liant Record, Inc., 36 T.C. 224, we held that three residential apartment buildings purchased by the petitioners with the proceeds from the compulsary or involuntary conversion of an office building owned by them did not constitute "property similar or related in service or ure to the property so converted" within the meaning of section 1033(a)(3)(A) of the Internal Revenue Code *293 of 1954, and that the gain of the petitioners upon the disposition of the office building was to be recognized in the taxable year 1955. We concluded that a "functional test" was to be applied in determining whether the property converted was replaced by property "similar or related in service or use," irrespective of the fact that the taxpayer itself did not use either the converted property or the replacement property, but held both properties for investment. The court of appeals rejected the use of the "functional test" as improper in this case, stating that there is a "single test to be applied to both users and investors, i.e., a comparison of the services or uses of the original and replacement properties to the taxpayer-owner." It further stated that "In applying such a test to a lessor, a court must compare, inter alia, the extent and type of the lessor's management activity, the amount and kind of services rendered by him to the tenants, and the nature of his business risks connected with the properties." The court of appeals, therefore, reversed and remanded the case for further consideration in accordance with its opinion. Pursuant to the mandate and a joint motion of *294 the parties, a rehearing was had before this Court for the purpose of taking additional evidence on the issue. Based upon the evidence presented at the rehearing we make the following: Supplemental Findings of Fact The office building at 1819 Broadway which was taken over by New York City under condemnation proceedings had been managed by William A. White & Sons, [1] an independent management firm engaged by the petitioners, under the supervision of the petitioner Jack Alpert. The White firm maintained local employees or agents in the building for the purpose of collecting rent, authorizing minor repairs costing less than $300, and keeping lists of prospective tenants. The three apartment buildings which were purchased in replacement of the office building were managed by employees of the petitioners under the supervision of Jack Alpert. The petitioners maintained local employees at each of the *295 apartment buildings, including a superintendent at each building, porters at two buildings and a doorman at one building. The superintendent of each building collected rents, authorized minor repairs and kept lists of prospective tenants. The leases for both the office building and the apartment buildings were generally for a period of two years and were all approved by Jack Alpert or someone designated by him. The petitioners used standard form leases, although the language of the leases for the office building differed somewhat from that of the leases for the apartment buildings. Office suites and other commercial space in the office building were rented unfurnished. The apartments and commercial space in the three apartment buildings were also rented unfurnished, except for three apartments in one of the buildings which were already furnished at the time of acquisition by the petitioners. The rental space in the office building differed for each floor, and some tenants rented entire floors. The rental space in the apartment buildings was the same for each floor. The petitioners made physical changes or alterations to the suites in all buildings at the request of tenants, although *296 in general changes were made more frequently in the office building than in the apartment buildings. The office building had public toilet facilities on each floor, while each of the apartment buildings had one public toilet in the laundry room. The apartments were provided with refrigerators, gas stoves, sinks and bathroom facilities which were maintained, not including cleaning, by the petitioners. The office building did not contain similar facilities, although a few office suites contained sinks. The lobbies of the apartment buildings were furnished, while the office building lobby had nothing but a few benches. The petitioners had performed cleaning services in the office building in both the rented space and in the public areas. This consisted of the daily emptying of waste paper baskets, dusting the furniture, and cleaning the floors when necessary, and washing windows when necessary. The petitioners did no cleaning in the apartment buildings except in the public areas. The petitioners were responsible for painting, decorating and repairing the exterior and interior in both the office building and the apartment buildings, and all such buildings had maintenance crews. The *297 petitioners supplied all of the buildings with elevator service, including a starter in the office building during rush hours; hot and cold water; and gas lines and electrical wiring and fixtures. In all cases the tenants were responsible for payment of lighting bills in the rented areas. Neither the office building nor any of the apartment buildings was equipped with central air conditioning. The office building and the apartment buildings were all located in good areas of the Borough of Manhattan in New York City. They were all subject to the New York state rent control law, and vacancies in each building were negligible. Tax rates were the same for each building, the same insurance coverage was available and was obtained for each building, and the same conventional financing was available for each building without personal liability on the part of the owners. Ultimate Finding of Fact There were no substantial differences in the management activities of the petitioners, in the services rendered by them to tenants or in the business risks involved with respect to the apartment buildings as compared with the office building. Opinion It is to be noted that section 1033(a)(3)(A) *298 of the Code [2] does not require that the replacement property be identical in service or use to the original property, but that it be "similar or related" in service or use. Accordingly, we construe the opinion of the court of appeals as meaning that the apartment buildings here involved are to be considered as "similar or related in service of use" to the office building unless there was substantial difference between, inter alis, the extent and type of the petitioners' management activity, the amount and kind of services rendered by them to tenants, or the nature of their business risks with respect to the apartment buildings, as compared with the office building. *299 The respondent contends that the burden of proof in these respects was upon the petitioners; that they have failed to show that there were not substantial differences; that, rather, the evidence shows that there were substantial differences; that the petitioners in reality became owner-operators of the apartment buildings whereas they were owner-investors with respect to the office building; and that therefore the petitioners' relationship to the replacement properties differed substantially from their relationship to the original property. We have set forth in some detail in the above Supplemental Findings of Fact the differences and similarities in the petitioners' management activity, the services rendered by them to tenants, and their business risks with respect to the apartment buildings as compared with the office building. We have concluded, and have found as an ultimate fact, that the differences in these respects are not substantial. Cf. The Clifton Investment Company v. Commissioner, (C.A. 6) 312 F. 2d 719 (February 2, 1963), affg. 36 T.C. 569, in which the court concluded that what the replacement property there involved (a hotel) demanded *300 of the taxpayer in the way of management, services, and relations to tenants, as compared with the replaced property (an office building), varied materially. The respondent makes much of the fact that the petitioners had engaged a firm of real estate managing agents to manage the office building, whereas they undertook to manage the apartment buildings themselves, through their employees. However, we do not consider this of cotrolling significance. The important thing is that there were no substantial differences in the management activity and the kind and amount of services for which the petitioners were responsible. Performance of management activities and rendition of services through a managing agent is not essentially different from the execution of those functions through employees. It may be added that Jack Alpert, on behalf of all the petitioners, exercised considerable supervision over both the original and the replacement properties, and with respect to all properties either he or someone designated by him approved all leases. We see no essential difference between the business risks with respect to the original property and the replacement properties. Both the office *301 building and the apartment buildings were in good areas in the same borough in New York City, both were subject to the state rent control law, and similar financing and insurance coverage were available with respect to all of the properties. Jack Alpert testified that both the original and the replacement properties were sound and prudent investments involving equal risk of loss of rental income, and there is nothing in the record to indicate otherwise. He testified that vacancies were negligible in all the properties. It is accordingly our conclusion that, under the test laid down by the court of appeals, the apartment buildings which were purchased were "similar or related in service or use" to the office building which was converted. Since the total amounts realized by each of the petitioners upon the conversion of the office building did not exceed the cost of his interest in the apartment buildings, section 1033(a)(3)(A) of the Code precludes recognition of the gain derived by the petitioners upon the conversion of the office building. Decisions will be entered under Rule 50. Footnotes
1. This firm managed both commercial buildings and residential apartment buildings. It maintained different leasing departments for different types of buildings; some of its employees handled only commercial properties while some handled both commercial and residential properties.↩
2. Sec. 1033. (a) General Rule. - If property (as a result of its destruction in whole or in part, theft seizure, or requisition or condemnation or threat or imminence thereof) is compulsotily or involuntarily converted - * * *
(3) Conversion Into Money Where Disposition Occurred After 1950. - Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of Gain. - If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. * * *↩