WINTER REALTY & CONSTRUCTION CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 107310. Promulgated June 9, 1943.

*William Cogger, Esq.*, and *Philip F. Biggins, Esq.*, for the petitioner.

*Thomas H. Lewis, Jr., Esq.*, for the respondent.

OPINION.

BLACK, *Judge:* We shall consider the issues in the order-assigned.

*Issues (a), (b), and (c).*—Prior to 1932 the city of New York took by condemnation proceedings certain property owned by petitioner and during the years 1932, 1935, and 1936 it paid petitioner a total of $430,500 as compensation (exclusive of interest) for the property taken. This compensation represented a capital gain to petitioner of $250,379.65. Petitioner contends that it is entitled to the benefit of section 112 (f) of the Revenue Acts of 1932, 1934, and 1936, and that in accordance therewith no part of this gain should be recognized. Section 112 (f) is identical in the three acts mentioned, and is set forth in the margin.[3] The cases involving section 112 (f) and its prototype in other revenue acts are collected and analyzed in Mertens, Law of Federal Income Taxation, vol. 3, secs. 20.120 to 20.129, incl.

Petitioner contends that the award money it received as a result of the involuntary conversion of its property (parcels 2, 14, 29, 36a, and 31) into money was "forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted * * * or in the establishment of a replacement fund." The respondent contends that neither one of these things occurred, and that, therefore, the entire gain should be recognized. Petitioner does not contend that any of the award money was expended "in the acquisition of control of a corporation owning such other property." In his opening statement counsel for the petitioner said "We agree with all the figures in the 90 day letter, except as to land value as of March 1st, 1913 on parcel 29, and also on parcel 31." Petitioner offered no evidence of a March 1, 1913, value different from that determined by the respondent, and in the absence of such evidence the respondent's determination is sustained.

We shall first consider whether any of the award money was expended in the establishment of a replacement fund. The statute

---

[3] (f) INVOLUNTARY CONVERSIONS.—If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain or loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so-expended.

requires that if any of the money is so expended it be done "under regulations prescribed by the Commissioner with the approval of the Secretary." The first award money received was on May 12, 1932.[4] The net amount received on that date, after deducting collection fees of $9,371.79, was $160,092.81. Article 580 of Regulations 77 is set forth in the margin.[5]

At some time between May 12 and December 31, 1932, petitioner made an application for permission to establish a replacement fund. The respondent has no record of such application having been made and contends that no such application was made until the one that was filed on February 3, 1937. But we are satisfied from the testimony of petitioner's manager that after acquainting himself with the Commissioner's regulations he personally, during 1932, secured the necessary blanks, filled them out and filed them. This testimony is supported by the letter to the collector dated March 15, 1933, the body of which is in our findings, and by the testimony of a real estate man, William R. Plaatje, who had his office in the same room where petitioner had its office. Plaatje testified that he saw the forms being prepared in 1932, and that he furnished the necessary appraisals of the March 1, 1913, value of the condemned property. The respondent makes a point on there being no completed bond filed with the alleged application. The instructions on Form 1114 did not require the bond to be completed until after the Commissioner had granted the application by signing the "permit" printed thereon and had returned all three copies of the form to the applicant.

---

At that time the Revenue Act of 1932 had not yet been enacted. The Revenue Act of 1928 and Regulations 74 were then in effect. The Revenue Act of 1932 was approved on June 6, 1932, and its provisions were made to apply "to the taxable year 1932 and succeeding taxable years." Sec. 1, 1932 Act. Regulations 77 under the 1932 Act were approved on February 10, 1933. But section 112 (f) of the Revenue Act of 1932 and article 580 of Regulations 77 were identical with section 112 (f) of the Revenue Act of 1928 and article 580 of Regulations 74, respectively. So as far as the establishment of a replacement fund is concerned, the applicable statute and regulations for the year 1932 were not in any way changed from what they were on May 12, 1932, when the first award money was received.

[5] ART. 580. *Replacement funds.*—In any case where the taxpayer elects to replace or restore the converted property but it is not practicable to do so immediately, he may obtain permission to establish a replacement fund in his accounts in which part or all of the compensation so received shall be held, without deduction for the payment of any mortgage. In such a case the taxpayer should make application to the Commissioner on Form 1114 for permission to establish such a replacement fund, and in his application should recite all the facts relating to the transaction and declare that he will proceed as expeditiously as possible to replace or restore such property. The taxpayer will be required to furnish a bond with such surety as the Commissioner may require in an amount not in excess of double the estimated additional income taxes which would be payable if no replacement fund were established. (See section 1126 of the Revenue Act of 1926.) The estimated additional taxes, for the amount of which the claimant is required to furnish security, should be computed at the rates at which the claimant would have been obliged to pay, taking into consideration the remainder of his net income and resolving against him all matters in dispute affecting the amount of the tax. Only surety companies holding certificates of authority from the Secretary of the Treasury as acceptable sureties on Federal bonds will be approved as sureties. The application should be executed in triplicate, so that the Commissioner, the applicant, and the surety or depositary may each have a copy.

Petitioner made several inquiries about its application and was finally told to file another one, which petitioner did on February 3, 1937, the receipt of which was acknowledged by the Commissioner in his letter dated February 19, 1937. Aside from this letter of acknowledgment, the Commissioner has never acted upon the second application unless the deficiency notice herein be regarded as a rejection thereof. Under these circumstances we shall discuss this question as if petitioner had obtained "permission to establish a replacement fund" under article 580, *supra*.

Did petitioner in fact establish a replacement fund? The mere establishment of a replacement fund with the Commissioner's permission, even if one is established, does not forever exempt the gain from being recognized and taxed. The purpose of permitting such a fund to be established is only to give the taxpayer additional time to replace or restore the property condemned. If that is not done within the time allowed, then the taxpayer must pay the tax that would have been due in the year in which the award was received without any benefit from section 112 (f). In schedule A of the second application, filed February 3, 1937, petitioner stated "1937" as the "Date replacement will be completed." Up to the date of the hearing in this proceeding the only replacements that have been made are the replacements hereinafter mentioned. Petitioner invested $190,735.57 of the award money in mortgages, and the balance, after making due allowances for the amounts which were expended in acquiring property of a like kind or character, was commingled with its other funds and used to pay dividends and its current expenses.

The statute provides at least a temporary nonrecognition of the gain if money into which the property was involuntarily converted is forthwith "expended * * * in the establishment of a replacement fund." The setting up on the liability side of its ledger of a reserve account called "Replacement Fund" in the amounts set out in our findings is not in itself the establishment of a replacement fund. Cf. *M. J. Caldbeck Corporation*, 36 B. T. A. 452, 456. Such an account does not reflect the investment of money in the establishment of a fund. The taxpayer must invest the money in assets which have been designated in some way as being held for replacement purposes. This was not done in the instant proceedings. We are unable to find among the petitioner's assets any account representing a separate fund set apart from the other assets to be used only for the purpose of replacing the property that was condemned. The petitioner does not call our attention to any. The only asset which might conceivably be adequate for this purpose is one described as "Mortgages receivable." However, this asset does not correspond in amount to the replacement fund item which the petitioner has set up among its liabilities and it has not been designated in any way as representing a

replacement fund. Furthermore, mortgages would probably not be regarded as an ideal investment for the purpose of a replacement fund of this character because they might not be readily convertible when the time for actual replacement arrived. Thus, we regard the mortgages which this petitioner purchased as simply investments of a wholly different class from the property condemned and having no relation to a replacement fund. We hold, therefore, that no part of the award money was expended in the establishment of a replacement fund.

We next consider whether any of the award money was "forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted." This is a question of fact. *Frischkorn Development Co.* v. *Commissioner*, 88 Fed. (2d) 1009. We have found in our findings that petitioner did so expend $96,830.19 of the award money which it received. Our findings in this respect are quite full in that they set out in considerable detail the kind of property that was condemned and the kind of property that was acquired in its place. We are satisfied from the evidence that property acquired in the amount of $96,830.19 was similar or related in service or use to the property taken, and have so found as a fact, and that it was acquired "forthwith" as required by the statute. Cf. *M. J. Caldbeck Corporation, supra.* The respondent contends that the $16,273.87 which was expended for certain benefit assessments on the Peter Haff Huis property as shown in our findings of fact was not a replacement expenditure. We agree with respondent in this contention. However, it becomes unimportant to our decision. As pointed out hereinafter, although petitioner in 1936 expended $117,880.64 in the manner detailed in our findings, including the $16,273.87 to which respondent objects, it expended only $51,116.25 forthwith in the acquisition of other property similar or related to that which it gave up. Our explanation of this latter statement will follow later in our opinion.

The money which petitioner invested in mortgages as detailed in our findings, while expended "forthwith," was not expended in the acquisition of other property similar or related in service or use to the property which the city took. As stated in *Washington Market Co.*, 25 B. T. A. 576, 584, "The test to be applied in determining whether there is a replacement is the character of the service or use. It is not a financial test."

Since only a part of the award money was forthwith expended in the acquisition of other property similar or related in service or use to the property condemned, the last sentence of section 112 (f), *supra*, becomes applicable, and the gain must be recognized "in an amount

not in excess of the money which is not so expended." The parties are not in agreement as to the amount of "money" that could be expended for the purposes set out in section 112 (f). Petitioner contends that it is the gross award, less the collection fees and the special assessments. The respondent contends that it is the gross award, less only the special assessments, and that to deduct also the collection fees would be to allow a double deduction to that extent. We do not agree with the respondent on this point. There is no double deduction being allowed. Both items come off in·determining the gain, as the respondent has done in his deficiency notice. The statute makes provision for the "basis" the newly acquired property is to take. See sections 113 (a) (10) of the Revenue Act of 1932 and 113 (a) (9) of the Revenue Acts of 1934 and 1936. Petitioner, in so far as the provisions of section 112 (f) are concerned, could not expend in the acquisition of other property more than the net amount of money it received, which would be the gross award less the collection fees and the special assessments. We hold, therefore, that the amount of capital gain determined by the respondent for the years 1932, 1935, and 1936 should, under section 112 (f), *supra*, be recognized as follows:

|  | 1932 | 1935 | 1936 |
|---|---|---|---|
| Gross award | $169,664.60 | $142,021.60 | $118,813.80 |
| Less collection fees and special assessments | 9,371.79 | 16,286.03 | 17,697.55 |
| Amount that could be expended for similar property | 160,292.81 | 125,735.57 | 101,116.25 |
| Amount that was expended for similar property | 45,713.94 | None | 51,116.25 |
| Amount that was not expended for similar property | 114,578.87 | 125,735.57 | 50,000.00 |
| Gain realized | 23,527.98 | 125,735.57 | 101,116.10 |
| Gain to be recognized | 23,527.98 | 125,735.57 | 50,000.00 |

It will be noted that in the above table we have said as to the year 1935: "Amount that was expended for similar property, none." The reason for that is that the evidence shows that in 1935 petitioner received a net amount of $125,735.57 from the awards. None of this was invested forthwith by petitioner in "other property similar or related in service or use to the property so converted." All this money was invested in mortgages, as detailed in our findings, and so far as the record shows it still remains so invested. Therefore, none of the gain realized by petitioner in 1935 from the collection of this $125,735.57 escapes taxation by reason of section 112 (f).

It will also be noted that in the above table we have said as to the year 1936: "Amount that was expended for similar property, $51,116.25." Our findings of fact show that petitioner in 1936 acquired land and made improvements to the amount of $117,880.64. However, not all this was done with award money. Petitioner received in 1936 a net amount of $101,116.25 as award from the city of New York.

Of this amount $50,000 was immediately invested in mortgages, which we have held not to be other property similar or related in service or use to the property condemned by the city of New York. Therefore, of the $101,116.25 received by petitioner as award money in 1936, petitioner expended only $51,116.25 in the acquisition of other similar or related property. This latter amount is the amount to be used in reducing petitioner's gain to be recognized in 1936.

*Issue (d).*—The assignment of error as to this issue is that the respondent erred by adding to petitioner's income interest "disallowed as a deduction" amounting to $3,415.67. There is no evidence that petitioner ever claimed this amount as a "deduction" for interest paid. What the respondent determined was that petitioner had made a loan to the Crommelin Realty Corporation; that during 1932 interest had accrued on this loan in the amount of $3,415.67; that petitioner had not reported this accrual as income; and that since petitioner was on the accrual basis it should have reported the interest as income. Petitioner's evidence in support of this assignment of error was very meager and we think is wholly insufficient to refute the presumed correctness of respondent's determination. We, therefore, sustain respondent as to this item of $3,415.67.

*Issue (e).*—No evidence was offered as to this issue. We, therefore, sustain the respondent's determination as far as this issue is concerned.

*Issues (f) and (h).*—In its assignments of error petitioner alleges that the respondent erred "by disallowing an interest deduction" of $24,537.59 and $7,287.98, respectively. Like issue (d), *supra*, the respondent did not "disallow" any interest deduction. What he did was to determine that petitioner failed to report all of the interest it received from the city in 1935 and 1936, respectively. The respondent determined that, because the amount of the award was in litigation, the interest thereon was not taxable income until the year the final court decree was entered and the amount of the award became fixed. This is in accord with *Patrick McGuirl, Inc.* v. *Commissioner*, 74 Fed. (2d) 729; certiorari denied, 295 U. S. 748. Petitioner in its brief contends that the amounts designated as interest were not interest, but a part of the awards, citing *Edith Henry Barbour*, 44 B. T. A. 1117, and under issues (a), (b) and (c), *supra*, it has contended that no gain from the awards should be recognized. It is now settled that the amounts received in 1935 and 1936 of $39,025.75 and $35,066.19, respectively, designated as interest were not a part of the awards, but were ordinary income under section 22 (a) of the Revenue Acts of 1934 and 1936, respectively. *Kieselbach* v. *Commissioner* 317 U. S. 399. These amounts did not accrue until 1935 and 1936, respectively, the years in which the final court decrees fixing the amount of the awards were entered. *Patrick McGuirl, Inc.* v. *Commissioner, supra.*

Since petitioner reported as interest from these awards in 1935 and 1936 only the amounts of $14,488.16 and $28,339.54, respectively, it follows that the respondent correctly added to petitioner's income for 1935 and 1936 the amounts of $24,537.59 and $6,726.65, respectively.

For the year 1936 the respondent also increased petitioner's income by interest in the amount of $561.33. This is a part of assignment of error (h). Petitioner offered no evidence as to this item, so the respondent's determination in connection therewith is sustained.

*Issue (g)*.—During the taxable year 1935 petitioner on its return claimed a deduction of $10,800 for officers' salaries, and for each of the years 1936, 1937, and 1938, it claimed a deduction of $21,600. The respondent determined that a total deduction of $2,400 for each of the years 1935 to 1938, inclusive, represented a fair and reasonable allowance.

The question of what constitutes a "reasonable allowance for salaries or other compensation for personal services actually rendered," allowed as deductions as "ordinary and necessary expenses" in computing net income under section 23 (a) of the Revenue Acts of 1934, 1936, and 1938, is a question of fact. The determination thereof by the respondent is prima facie correct and the burden is upon the petitioner to establish by a fair preponderance of the evidence that the determination is not correct. *Helvering* v. *Superior Wines & Liquors, Inc.*, 134 Fed. (2d) 373; *Van Hooser & Co.* v. *Glenn*, 50 Fed. Supp. 279, and cases therein cited.

We do not think petitioner has met this burden. Most of the work of this corporation connected with the properties which it owned, such as the collection of interest and rents, was done by Laurence B. Halleran through his Halleran agency. He was petitioner's manager but was not one of its officers. For compensation as manager he was paid $3,600 in 1935 and nothing in 1936, 1937, and 1938. The respondent has allowed as an expense deduction all the compensation paid to Laurence. Small parts of the work of the corporation were done by two brothers, a sister, a sister-in-law, and a nephew of Laurence. For this comparatively small part of the work petitioner is claiming total officers' salaries of $75,600 for the four years in question. In the language of the Supreme Court in *Botany Worsted Mills* v. *United States*, 278 U. S. 282, "it is clear that extraordinary, unusual and extravagant amounts paid by a corporation to its officers in the guise and form of compensation for their services, but having no substantial relation to the measure of their services and being utterly disproportioned to their value, are not in reality payment for services, and cannot be regarded as 'ordinary and necessary expenses.' " The only officer who rendered any service to amount to anything, so far as the record of evidence shows, was William

J. Halleran. He testified that he was the outside man that handled all the repairs (total repairs for 1935 to 1938, inclusive, amounted to only $3,543.37) for petitioner; that he was on call "in case anything happens" 24 hours a day; that he has been called out six to eight times a year on different things that happened; and that he had to see that the ragweed was cut from vacant land and snow shoveled from sidewalks. He did the same work for the other two family corporations, Flushingside and Twinboro. The other officers rendered practically no service. And when consideration is given to the fact that the payments made to the Halleran family were so arranged that each stockholder (except Julia, who owned twice as much stock in two of the corporations) received from the three corporations substantially the same total amount in compensation and dividends, it seems clear that the respondent was justified in disallowing the greater part of the amounts deducted by petitioner as salaries of its officers. Petitioner has not shown that its officers actually rendered any personal services that would call for a reasonable allowance for salaries or other compensation of an amount in excess of that determined and allowed by the respondent. We, therefore, sustain the respondent's determination as to this issue.

*Decision will be entered under Rule 50.*