*Decision will be entered under Rule 50.*

STEUART BROS., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60494. Filed November 27, 1957.

*Robert P. Smith, Esq.*, for the petitioner.
*William Schwerdtfedger, Esq.*, for the respondent.

#### OPINION.

TRAIN, *Judge:* The Commissioner determined a deficiency of $81,162.37 in the income tax of petitioner for the calendar year ended

December 31, 1951. The only issue is whether petitioner reinvested the proceeds from condemnation proceedings in "property similar or related in service or use" to the property condemned within the meaning of section 112 (f) of the Internal Revenue Code of 1939.

All the facts have been stipulated, and are hereby found as stipulated.

Petitioner is a Delaware corporation with its principal place of business in Washington, D. C., and has been engaged in business since January 2, 1925. It filed its income tax return for the calendar year ended December 31, 1951, with the then collector of internal revenue for the district of Maryland. From its inception to the present time, petitioner's business has consisted of acquiring improved and unimproved realty for income-producing purposes. In connection with unimproved realty acquired, petitioner has constructed buildings thereon for speculative leasing or according to specifications of the lessee. Substantially all of its income since its inception in business has been from the rental of such investment properties.

Early in 1948 petitioner purchased a parcel of commercially zoned vacant land in northeast Washington, D. C., of approximately 4½ acres bounded by Kenilworth Avenue on the west and the tracks of the Pennsylvania Railroad on the east, and near Blaine Street on the north and East Capitol Street on the south. The cost of the property to petitioner was $33,181. During 1948, petitioner expended $37,760.46 in improving the land by ditching, grading, and clearing the premises preparatory to commercial use, making a total investment therein of $70,941.46. At the time of purchase, Kenilworth Avenue was a dedicated street but as yet ungraded and unpaved. During 1949 and 1950, the street was graded and improved.

In the summer of 1949, petitioner entered into negotiations with Square Deal Market Company, Inc., which is a corporation operating a chain of retail grocery stores in the Washington metropolitan area, wherein petitioner agreed to construct a large 1-story warehouse building on the southwest portion of the property to the specifications of Square Deal and to lease the same to Square Deal for a period of 10 years. A written agreement to that effect was entered into September 14, 1949, between petitioner and Square Deal. On December 13, 1949, petitioner filed with the appropriate officials of the District of Columbia an application for a permit to build the said building according to the plans and specifications of Square Deal drawn up by an architect. Thereafter petitioner was advised by officials of the District of Columbia that the permit would not be issued because this portion of the property was to be condemned. At this time, the

District officials did not advise or inform the petitioner of any intention or plans to condemn or take the remainder of the property in question.

In early 1950, petitioner and Manor Real Estate and Trust Company, an affiliate of the Pennsylvania Railroad, entered into an agreement whereby petitioner was to construct a large 1-story warehouse building, with adjacent parking area, to the specifications of Kane Transfer Company, a motor carrier and owner and operator of warehouses, the proposed subleasee, and to lease the same for a period of 10 years. The leased premises were to be situated on the remainder of petitioner's property north of that portion which petitioner had been formerly advised would be condemned. The above agreement was to be executed upon the granting of a permit to build.

An application for a permit to build was filed on September 18, 1950, and the District officials refused to issue the permit advising petitioner at this time that this remaining portion was subject to future condemnation. The entire property was thereafter condemned to provide access for the East Capitol Street bridge, and, on December 26, 1951, petitioner was granted an award by the District of Columbia for the condemned property in the amount of $425,000. With this sum, petitioner immediately opened a special bank account. Petitioner's attorney's fee attributable to the said condemnation and seizure was $5,000. The gain realized by petitioner from the condemnation was $349,058.54.

During 1951 and the early part of 1952, petitioner investigated available vacant land as well as improved realty in the Washington metropolitan area for the purpose of replacing the condemned property. In early 1952, petitioner entered into negotiations with Continental Oil Company to acquire three parcels of improved commercial property. In June 1952, petitioner purchased from Continental the property located at 1401 Rhode Island Avenue, N. E., Washington, D. C., for $376,170. On this property was located a 1-story masonry building used as automobile salesrooms, garage, and service station, the remainder of the property being used as a parking and used car lot. At that time and since, the premises have been leased to motor companies. In December 1952, petitioner purchased from Continental two parcels of property, one at Third and H Streets, N. E., and the other at Fourteenth and Swann Streets, N. W., both in Washington, D. C., at a total price of $236,485.28. The Third and H Streets property is improved with two 1-story masonry buildings which were being used as automobile showrooms, automotive repair shop, garage, and service station, the remaining portion as a parking and used car lot. This property was and is under lease to Steuart Motor Co., Inc. The Fourteenth and Swann Streets, N. W., property

has thereon a 2-story masonry building which was being used as a service station under lease to an individual. Presently the property is under lease to a taxicab company.

The $425,000 condemnation award was used as follows:

| | |
|---|---|
| Attorney's fee | $5,000 |
| Purchase of Rhode Island Avenue property | 376,170 |
| Purchase of H Street and Fourteenth Street properties | 43,830 |
| | 425,000 |

The United States Department of Commerce on September 13, 1950, created the National Production Authority, which imposed certain building restrictions.

The petitioner properly filed for and was granted by the Commissioner an extension of time under section 112 (f) within which to replace the converted property and such replacement was timely made.

Petitioner contends that in its business the only purpose or use any property has to it is to produce income, by way of rent or otherwise, and that since the old and new properties had such purpose, the new properties were, if not "similar," at least related in service or use to the old. The Commissioner argues that the statute was not intended to be so broadly construed, and that a mere replacement of rental income property with rental income property does not of itself mean that the new property is similar or related in service or use within the meaning of section 112 (f), I. R. C. 1939.[1]

We agree with the Commissioner.

Something more than the fact that both properties were investment properties or were held for the purpose of deriving operating profits, rental income, or interest income is required. *Winter Realty & Construction Co.* v. *Commissioner*, 149 F. 2d 567 (C. A. 2, 1945), affirming on this issue 2 T. C. 38 (1943), certiorari denied 326 U. S.

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(f) INVOLUNTARY CONVERSION.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) Nonrecognition of Gain.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe. \* \* \*

754 (1945); see *Lynchburg National Bank & Trust Co.* v. *Commissioner*, 208 F. 2d 757 (C. A. 4, 1953), affirming 20 T. C. 670 (1953). Nor do we think it controlling that petitioner is in the business of acquiring and holding real property for the purpose of deriving rental income therefrom. Petitioner relies upon H. Rept. No. 798, 82d Cong., 1st Sess., p. 2, particularly the language—

For example, if the Government by condemnation acquires farm land used by the taxpayer for growing crops and the taxpayer for the purpose of replacing the converted property purchases other farm land to be used for raising livestock or for growing fruit, such replacement property meets the requirement of being similar or related in service or use to the property converted.

Further, petitioner asserts that the instant case is controlled by *Gaynor News Co.*, 22 T. C. 1172 (1954). However, in the example in the committee report there is a retention of the same general functional use of the old land in the new, that of farming. In *Gaynor News Co.*, *supra*, the new land fulfilled the same purpose and function for which the old land was acquired in that it provided premises for the taxpayer's manufacturing plant. In the instant case, even assuming that the warehouses had been built on the original property, there would have been no functional similarity or relation in use to service stations, garages, and parking lots. While the nature of a taxpayer's business might be important under different circumstances, here it aids petitioner only in showing that the type of profit it intended to derive from the condemned land and the new properties was the same. The business in which petitioner is engaged does not limit it to investing in property which has similar uses and functions; the properties need only be, in petitioner's judgment, good commercial investments and in this respect the petitioner is in a different position than is a farmer, or the taxpayer in *Gaynor News Co.*, *supra*. Petitioner itself acknowledges this fact in its brief where it states:

It did not matter to the Petitioner whether the rentals were derived from a storage bin, an oil reservoir, an office building, a warehouse, or an automobile sales room. Its purpose, function and use was the same.

Petitioner points out that the statute, since it is a relief provision intended to prevent an unfair incidence of taxation, has been liberally construed by this Court. *Massillon-Cleveland-Akron Sign Co.*, 15 T. C. 79 (1950). Exact duplication of the converted property is not required. Nevertheless, we have adhered to what has been referred to as a "functional" test and we see no reason in departing from this construction of the statute. *Lynchburg National Bank & Trust Co.*, *supra; Kimbell-Diamond Milling Co.*, 10 T. C. 7 (1948); *Davis Regulator Co.*, 36 B. T. A. 437 (1937); *M. J. Caldbeck Corporation*, 36 B. T. A. 452 (1937). As was said in *Lynchburg National Bank & Trust Co.* v. *Commissioner*, 208 F. 2d 757, 758:

To hold otherwise would be to say that the replacement of one commercial building by another commercial building is sufficient under the statute to avoid the recognition of gain, no matter how dissimilar or unrelated their respective purposes may be, and we do not think that the statute has that meaning.

This being the case, the statutory test is not necessarily satisfied by a mere replacement of one parcel of income-producing real property with another, for in such a replacement, the function of the old and new properties would not necessarily be similar or related. To hold such replacement sufficient per se would be to eliminate any meaningful requirement of similarity or relation in service or use, whether or not the particular taxpayer be in the business of holding rental property.

Petitioner, relying on *Gaynor News Co.*, *supra*, contends that the contemplated warehouse on the converted property should be considered as built, since presumably construction would have begun almost immediately were it not for the condemnation. Thus, petitioner asserts the original property should be considered improved rather than unimproved real estate for purposes of the statute, and Regulations 111, sec. 29.112 (f)–1,[2] which provide in part:

There is no investment in property similar in character and devoted to a similar use if—

(1) The proceeds of unimproved real estate, taken upon condemnation proceedings, are invested in improved real estate.

On the facts before us, even if petitioner's argument were accepted, the new properties do not meet the statutory requirement.

Petitioner asserts that because of respondent's knowledge of the nature of the new properties, and by the action he has taken, he is now estopped to deny petitioner the benefits of section 112 (f). Petitioner cites no authority for its contention. Petitioner's application for establishing a replacement fund stated that it had entered into negotiations for purchasing improved income-producing commercial property for $360,000 to replace the land on which the warehouses were to be built. The Commissioner replied that action would be deferred until the expiration of the period for replacement. Upon petitioner's request, respondent granted it a year's extension of time in which to make the replacement and later acknowledged that the proceeds received for the converted property had been fully expended to replace the condemned property.

But the respondent's action did not imply nor did his acknowledgment amount to a representation that the transaction here would result in nonrecognition of gain. Even if there had been a ruling to that effect, the Commissioner would not be estopped. *Washington Market Co.*, 25 B. T. A. 576 (1932). Further, there is no evidence

---

[2] This example is applicable to conversions under section 112 (f) (3) by reason of Regulations 111, sec. 29.112 (f)–3, 1953–1 C. B. 149, 151.

of reliance by the petitioner on any representations by the Commissioner to its detriment. The respondent is not estopped.

We hold that the three parcels of improved realty acquired by petitioner with the profits of the condemnation of the real property did not constitute property similar or related in service or use to the property condemned within the meaning of section 112 (f).

No other adjustments made by respondent are assigned as error by the petitioner.

Reviewed by the Court.

*Decision will be entered for the respondent.*