LIANT RECORD, INC., William I. Alpert and Paula G. Alpert, Abraham Alpert and Sarah Alpert, Jack L. Alpert, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 169, 392–394, Dockets 27192–27195.

United States Court of Appeals Second Circuit.

Argued Feb. 6, 1962.

Decided May 21, 1962.

Bernard J. Long, Washington, D. C. (Richard P. Milloy, Dow, Lohnes & Albertson, Washington, D. C., Harry J. Winick, A. J. Schiffer, Winick & Schiffer, New York City, on the brief), for petitioners.

Harold C. Wilkenfeld, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, and Arthur E. Strout, Dept.

of Justice, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and SWAN and WATERMAN, Circuit Judges.

LUMBARD, Chief Judge.

The sole question presented is whether the proceeds from the condemnation of an office building were reinvested in property which was "similar or related in service or use" within the meaning of § 1033 of the Internal Revenue Code of 1954 [1] when the taxpayers purchased three apartment buildings. The Tax Court held that they were not, since the tenants of the office building used the property for a different purpose than the tenants of the apartment buildings. We reverse and remand.

The taxpayers [2] and Norman Einstein owned a 25-story, steel-frame office building located at 1819 Broadway, Manhattan, New York. The building, which had been erected about 1913 was, on November 17, 1953, rented to 82 commercial tenants, including accountants, attorneys, real estate firms, a doctor, a dentist, and a bank, all of whom used it exclusively to conduct business. On November 17, 1953 the City of New York instituted condemnation proceedings against the taxpayers' office building and acquired title on the same date. Each of the taxpayers received payments in settlement for the condemned property during 1954 and 1955 which substantially exceeded their respective tax bases in the property.

Between July 12, 1955 and November 1, 1956 the taxpayers acquired three pieces of real estate each containing an apartment building. Each taxpayer's contribution to the total purchase prices of the three parcels exceeded his share of the proceeds from the condemnation.[3] The 9-story building located at 55 West 11th Street, New York City, contained 77 apartments used for residential purposes and 6 commercial tenants. The 6-story brick building at 400 East 80th Street, New York City, contained 47 residential apartments and 4 stores. The 11-story, steel-frame building located at 35 East 84th Street, New York City, contained 40 residential apartments and 6 commercial tenants. The taxpayers held the properties for rental income and did not occupy any of the properties.

The taxpayers, contending that their gain on the involuntary conversion was nontaxable under § 1033 of the Internal Revenue Code of 1954, did not report any income from the disposition of the condemned office building. The Commissioner, on the other hand, took the view that the three apartment buildings were not

---

1. "Sec. 1033. (a) General Rule.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted— * * *

"(3) Conversion into Money where Disposition Occurred after 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

"(A) Nonrecognition of gain.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. * * *"

2. Paula Alpert and Sarah Alpert are joined only because they filed joint returns with their husbands William I. Alpert and Abraham Alpert, respectively. Therefore, William I., Abraham, and Jack L. Alpert, who are brothers, and Liant Record, Inc., will herein be referred to as the taxpayers.

3. Each of the four taxpayers owned a part of the property located at 55 West 11th Street, New York City. Only the three Alpert brothers participated in the other two purchases.

328

"similar or related in service or use" to the condemned office building, and that therefore the taxpayers should have reported an aggregate capital gain on their 1955 income tax returns of $427,012.61.[4] Consequently, the Commissioner asserted an aggregate deficiency of $107,716.51 against the taxpayers. The Tax Court upheld the deficiency on the ground that the actual physical end use of the original property by the lessees as offices, differed from the end use of the replacement properties by the lessees as apartments. 36 T.C. 224 (1961). The taxpayers appeal.

When a taxpayer's property is involuntarily converted into cash which the taxpayer immediately expends in replacing the converted property, Congress thought it fair to postpone any tax on the gain. Winter Realty & Constr. Co. v. Commissioner, 149 F.2d 567 (2 Cir.), cert. denied, 326 U.S. 754, 66 S.Ct. 92, 90 L.Ed. 452 (1945). However, the fortuity of an involuntary conversion should not afford the taxpayer an opportunity to alter the nature of his investment tax-free. Therefore, under § 1033 and its predecessors,[5] tax postponement turns on whether the replacement property is "similar or related in service or use" to the converted property.

Most of the early cases interpreting this phrase involved owners of property who themselves used the property in their businesses. In these cases the Tax Court adopted a so-called "functional test" to determine whether the replacement property was similar or related in service or use to the converted property, i. e., the Tax Court compared the actual physical uses of both properties.[6] In those cases where an owner of property, instead of being a user, held the property for rental to others and replaced it with rental property, the Commissioner, the Third Circuit and the Tax Court literally applied this "functional test" by holding that the tenants' actual physical use of the converted and replacement properties must be similar or related.[7] Some courts, however, refusing to apply the "functional test" so strictly, have held that if the owner of rental property replaces it with rental property of "the same general class," he has maintained sufficient continuity of interest to deserve tax postponement.[8]

Since in enacting this section Congress intended the taxpayer-owner to maintain continuity of interest and not to alter the nature of his investment tax-free, it is the service or use which the properties have to the taxpayer-owner that is relevant. Thus when the taxpayer-owner himself uses the converted property, the Tax Court is correct in comparing the

4. A breakdown of the figures by taxpayer will be found in the Tax Court's opinion. 36 T.C. 224 (1961).

5. A similar provision was first enacted as §§ 214(a) (12) and 234(a) (14) of the Revenue Act of 1921.

6. Such a "functional test" is implied in such early cases as Washington Market Co. v. Commissioner, 25 B.T.A. 576 (1932); and Davis Regulator Co. v. Commissioner, 36 B.T.A. 437 (1937); but see, Haberland v. Commissioner, 25 B.T.A. 1370 (1932); and explicitly adopted in such later cases as Lynchburg National Bank & Trust Co. v. Commissioner, 20 T.C. 670, aff'd, 208 F.2d 757 (4 Cir. 1953); Gaynor News Co., Inc. v. Commissioner, 22 T.C. 1172 (1954); and Collins v. Commissioner, 29 T.C. 670 (1958).

7. McCaffrey v. Commissioner, 275 F.2d 27 (3 Cir. 1960), aff'g 31 T.C. 505 (1958),

cert. denied, 363 U.S. 828, 80 S.Ct. 1598, 4 L.Ed.2d 1523 (1960); Clifton Investment Co. v. Commissioner, 36 T.C. 569 (1961); Loco Realty Co. v. Commissioner, 35 T.C. 1059 (1961); Steuart Bros., Inc. v. Commissioner, 29 T.C. 372 (1957), reversed, 261 F.2d 580 (4 Cir. 1958); Rev.Rul. 56–347, 1956–2 Cum. Bull. 517. But see earlier Tax Court cases, M. J. Calbeck Corp. v. Commissioner, 36 B.T.A. 452 (1937); Winter Realty & Constr. Co. v. Commissioner, 2 T.C. 38, 41, 45, 53–55 (1943) (as to the $51,116.25), aff'd in part and reversed in part without mentioning this issue, 149 F.2d 567 (2 Cir.), cert. denied, 326 U.S. 754, 66 S.Ct. 92, 90 L.Ed. 452 (1945).

8. Steuart Bros., Inc. v. Commissioner, 261 F.2d 580 (4 Cir. 1958); Filippini v. United States, 200 F.Supp. 286 (N.D.Cal. 1961).

actual physical service or use which the end user makes of the converted and the replacement properties. However, if the taxpayer-owner is an investor rather than a user, it is not the lessees' actual physical use but the nature of the lessor's relation to the land which must be examined. For example, if the taxpayer-owner himself operated a retail grocery business on the original land and operated an automobile sales room on the replacement land, it would be obvious that by changing his own end use he had so changed the nature of his relationship to the property as to be outside the nonrecognition provision. However, where the taxpayer is a lessor, renting the original land and building for a retail grocery store and renting the replacement land and building for an automobile sales room, the nature of the taxpayer-owner's service or use of the property remains similar although that of the end user changes. There is, therefore, a single test to be applied to both users and investors, i. e., a comparison of the services or uses of the original and replacement properties *to the taxpayer-owner.* In applying such a test to a lessor, a court must compare, *inter alia,* the extent and type of the lessor's management activity, the amount and kind of services rendered by him to the tenants, and the nature of his business risks connected with the properties.

Section 1031 of the 1954 Code, 26 U.S. C.A. § 1031, has many similarities to § 1033, the provision here in question. While § 1033 postpones the taxation of gain on the involuntary conversion of any property into money which is then reinvested in property which is "similar or related in service or use," § 1031 postpones the taxation of gain when a narrower category, "property held for productive use in trade or business or for investment," is voluntarily exchanged directly for other property "of a like kind." "Like kind" has been interpreted as being much broader than "similar or related in service or use." [9] In 1958 Congress, disapproving of the narrow manner in which the § 1033 standard had been applied, S.Rept. No. 1983, 85th Cong., 2d Sess., pp. 72–73, U.S.Code Cong. and Admin.News 1958, p. 4791, amended § 1033 and made the "like kind" standard applicable to the condemnation of real estate "held for productive use in trade or business or for investment." [10] The government argues that because this amendment is specifically made prospective only, Congress meant to tax the gain on condemnations of real estate held for investment in transactions which antedated the amendment such as in the present case. However, the mere fact office buildings and apartment buildings are clearly of "like kind" does not mean that they are not also "similar or related in service or use."

Since the Tax Court examined only the actual physical end use of the properties in this case rather than comparing the properties' service or use to the taxpayer-lessor, we reverse and remand for further consideration in light of this opinion.

9. See, e. g., 3 Mertens, Law of Federal Income Taxation, § 20.171, pp. 659–60; Treas.Regs. § 1.1031(a)–1(c): Under § 1031 no gain or loss is recognized if "(2) a taxpayer who is not a dealer in real estate exchanges city real estate for a ranch or farm * * * or exchanges improved real estate for unimproved real estate. * * * "

10. Section 1033(g) (1): "For purposes of subsection (a), if real property (not including stock in trade or other property held primarily for sale) held for productive use in trade or business or for investment is (as the result of its seizure, requisition, or condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted."

Section 1033(g) (2) (B): "Paragraph (1) shall apply with respect to the compulsory or involuntary conversion of any real property only if the disposition of the converted property (within the meaning of subsection (a) (2)) occurs after December 31, 1957."