S. E. PONTICOS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 84692.   Filed April 18, 1963

*John J. Kelly, Jr.,* for the petitioner.
*Gene E. Hutson,* for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency in the petitioner's income tax for the calendar year 1956 in the amount of $28,551.49.

The only issue presented is whether the petitioner reinvested the proceeds received by it from the sale of property under threat of condemnation in other property "similar or related in service or use" to the property condemned within the meaning of section 1033(a)(3)(A) of the Internal Revenue Code of 1954.

### FINDINGS OF FACT

Most of the facts are stipulated and are so found.

S. E. Ponticos, Inc., hereinafter referred to as the petitioner, is a corporation organized and existing under the laws of the State of Ohio, with its office in Cincinnati. It filed its corporate income tax return for the taxable year ended December 31, 1956, with the district director of internal revenue in Cincinnati.

Petitioner was incorporated in 1946 to do business as a bar and restaurant fixtures manufacturer and as an investor in real estate. After 1954, petitioner was solely engaged in the investment of real estate.

In 1945 petitioner purchased improved real property at 112, 114, and 116 West Pearl Street, Cincinnati, Ohio, hereinafter referred to as the Pearl Street property. The six-story building was, in fact, composed of three connected buildings. The petitioner used the basement and the first floor of the building for several years in its fixtures business. Except for the renting of one floor to the Ohio Advertising Display Co. in 1948, the remaining portion of the building was unused until April 24, 1953.

In addition to the Pearl Street property, the petitioner owned other parcels of real estate which it held solely for investment purposes.

The fixtures business proved unprofitable and, in the latter part of 1950, remodeling was begun on the Pearl Street property to make it useful for other purposes. During the limited remodeling of the first floor, the petitioner applied for a permit to install a passenger elevator. This was refused by the building commissioner of the city of Cincinnati because the city intended to acquire the Pearl Street property for the construction of a highway. No more remodeling was done after the permit was refused.

On February 2, 1952, petitioner entered into a contract with George D. O'Brien, a real estate broker, to obtain a lessee for the building at a rental of $10,000 per year. After George D. O'Brien was unable to secure an acceptable lease, the petitioner leased the top five floors to the Ohio Advertising Display Co. on April 24, 1953, for $500 per month, to be used as a warehouse. The lease was for a term of 3 years with the right to renew for an additional 2 years and covered certain chattels in the form of machinery and tools which were already located on the leased floors. The machinery and tools were not used by the Ohio Advertising Display Co. but were to remain stored on the premises. The lease provided that the lessee was to make all repairs required of the interior and roof of the building, to insure the building and chattel property, and to install its own meters for gas and electricity. The only duties required of the petitioner as lessor were to keep the exterior of the building in repair and to repair damages caused by fire.

In the early part of 1954 the petitioner sold its fixtures business to Axiotes, Inc., which rented the first floor and basement for $250 per month. After selling the fixtures business, the petitioner was engaged exclusively in real estate rentals, construction of real estate, and security investments.

The Ohio Advertising Display Co. and Axiotes, Inc., continued to occupy the Pearl Street property until March 1956, when the city of Cincinnati asked them to vacate.

The Pearl Street property was sold to the city of Cincinnati under threat of condemnation on July 16, 1956, for $151,000. Petitioner's

adjusted basis for the property was $28,083.47. The petitioner's gain on the sale of the property was $122,916.53.

In 1956 and 1957 the petitioner reinvested the proceeds from the sale of the Pearl Street property in the construction of a garden-type apartment development, known as Ponticos Panoramic Estates, on real property owned by the petitioner at 2301–2375 Montana Avenue, Cincinnati, Ohio. The advertising brochure for Ponticos Panoramic Estates describes the apartments as being furnished with heat, water, air conditioning, laundries, hot water heaters, central vacuum cleaning system, and well-equipped kitchens. Playgrounds, a recreation area, and a swimming pool were to be available for the tenants. Petitioner was to provide a janitor to empty waste cans, clean hallways, keep grounds, and clear sidewalks and streets of ice and snow.

On its income tax return for 1956, the petitioner reported details of the sale of the Pearl Street property and that the proceeds were being reinvested in other real estate. The gain of $122,916.53 was treated as nonrecognizable. Respondent asserted that the proceeds were not reinvested in property "similar or related in service or use" and that the gain should be taxed as a long-term capital gain.

OPINION

Petitioner first contends that its transaction comes within the relief provisions of section 1033(a)(3)(A)[1] by relying on a "de facto" condemnation at the time the Cincinnati building commissioner refused its application for a passenger elevator. This refusal, the petitioner asserts, prevented it from converting the Pearl Street property into an apartment building and therefore amounted to a condemnation. Under such conditions the petitioner would have satisfied the "functional test" since it would have used proceeds from the sale of an "apartment" building to construct other apartment buildings. There is no showing that the Cincinnati Building Commission had the power to condemn property or the authority to inform parties of

---

[1] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

     *       *       *       *       *       *

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) Nonrecognition of Gain.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. * * *

threats of condemnation. Moreover, the evidence here does not warrant a finding that the Pearl Street property was in fact being remodeled into an apartment building. Therefore, we conclude that no condemnation, de facto or otherwise, occurred at that time.

Petitioner's alternative contention is that the "functional test" is not the correct test to apply to a taxpayer who is in the investment business. Respondent, on the other hand, urges that the "functional test" is the correct and *only* test applied by this Court in determining whether property is "similar or related" and that the petitioner has failed to meet this test.

We cannot agree entirely with either party. Simply stated, the issue to be determined in this proceeding is whether the taxpayer investor's use of the premises *or* his lessee's use of the premises must meet the "similar or related in service or use" limitation. In the past, we have applied the "functional test" to the end use or service of the property whether it was used in the taxpayer's own business or whether it was leased or rented by the taxpayer to other persons to be used in their businesses or as residences. It is in the latter instance that several circuit courts have differed with our position.

In *Steuart Brothers, Inc.*, 29 T.C. 372 (1957), which involved the equivalent provision of the Internal Revenue Code of 1939 (sec. 112(f)), this Court held that the taxpayer was not entitled to nonrecognition of gain where the proceeds of the involuntary conversion of property, proposed to be used for a warehouse, were reinvested in property containing garages, service stations, and an automobile salesroom. The Court of Appeals for the Fourth Circuit, 261 F. 2d 580 (1958), reversed this decision on the ground that the "investment characteristics" of the two properties were sufficient to meet the provisions of the statute.

Later, in *Thomas McCaffrey, Jr.*, 31 T.C. 505 (1958), we were again faced with the task of applying section 112(f) of the 1939 Code to investment property. We did not follow the Fourth Circuit in the *Steuart* case but held that the involuntary conversion of property used as a parking lot, and the reinvestment of the proceeds into stock of a corporation which held warehouse property for investment purposes, did not qualify for nonrecognition of gain. This opinion was affirmed by the Court of Appeals for the Third Circuit, 275 F. 2d 27 (1960), which agreed that the properties were not similar even though the taxpayers used the money invested in the old and the new property for the similar purpose of producing rental income.

Following the *McCaffrey* case, we held property not to be "similar or related in service or use" in *Loco Realty Co.*, 35 T.C. 1059 (1961), where a building rented to a shoe manufacturer was replaced by a building rented as a grocery warehouse; in *Liant Record, Inc.*, 36 T.C.

224 (1961), where an office building was replaced by apartment buildings; and in *Clifton Investment Co.*, 36 T.C. 569 (1961), where an office building was replaced by stock in a hotel. In each of these cases the Court applied the "functional test," rejecting taxpayers' contentions that the "functional test" should not be followed where the property is held for investment purposes.

In reversing us in *Loco Realty Co.* v. *Commissioner*, 306 F. 2d 207 (1962), the Court of Appeals for the Eighth Circuit, agreeing that there must be some restriction, said:

that it is sufficient if, coupled with the leasehold characteristic of the taxpayer's properties, there is also a reasonable similarity in the leased premises themselves.

The Court of Appeals for the Second Circuit, reversing us in *Liant Record, Inc.* v. *Commissioner*, 303 F. 2d 326 (1962), advocated the following criteria of similarity:

a court must compare *inter alia*, the extent and type of the lessor's management activity, the amount and kind of services rendered by him to the tenants, and the nature of his business risks connected with the properties.

In *Clifton Investment Co.* v. *Commissioner*, 312 F. 2d 719 (1963), the Sixth Circuit affirmed our determination that the replacement property was not "similar or related in service or use" to the converted property, but in so holding, rejected the "functional test" or "end-use test" applied by this Court. The Court of Appeals applied the "management activity test" as advocated by the Second Circuit court in *Liant* and found that although both properties were held for the production of rental income the activities required of the taxpayer by the hotel in the way of management, services, and relationship to its tenants varied materially from its operation of the office building.[2]

The "management activity test" of *Liant* was also followed by the Seventh Circuit Court in *Pohn* v. *Commissioner*, 309 F. 2d 427 (1962), reversing a Memorandum Opinion of this Court.

The basic purpose of section 1033(a)(3)(A) undoubtedly is to allow the taxpayer to replace his property or to continue his investment without realizing gain where he is compelled to give up such property because of circumstances beyond his control. Congress did see fit, however, to limit this relief by requiring the two properties to be "similar or related in service or use." Because we think a taxpayer should not be able to receive the benefit of section 1033(a)(3)(A) and at the same time materially alter his type of business or nature of investment, there should be something more than mere "investment characteristics" in the two properties to qualify

---

[2] But see *Capitol Motor Car Co.* v. *Commissioner*, 314 F. 2d 469 (1963), where the Sixth Circuit reversing a Memorandum Opinion of this Court, found improved property, which had been leased to an automobile agency, to a school, and then to a gas company, to be similar or related in service or use to vacant land upon which the lessee had contracted to build a motel.

for nonrecognition of gain. While several of the Courts of Appeals have rejected the application of the "functional test" to taxpayer lessors, they have substituted other tests, realizing that there should be some limitation.

This petitioner cannot prevail whether we apply the "functional test" or the criteria stressed by the Courts of Appeals in *Liant Record, Clifton Investment*, and the other cases. Obviously, the "functional test" is not met here. And we think it is equally clear that petitioner cannot qualify for nonrecognition of gain under the criteria which require a comparison of the natures of the taxpayer's investments. In making such a comparison, the characteristics of the leased premises, the lessor's management activities, the amount and kind of services rendered to the tenants, the nature of the business risks connected with the properties, and any other factors that would be helpful in determining whether the taxpayer has reestablished himself in a business position reasonably similar to that which he occupied before the involuntary conversion occurred, should be considered.

Here the facts do not support a conclusion that the petitioner has reestablished itself in a reasonably similar business position. On the contrary, they show that the nature of the petitioner's investment has changed materially. While both properties were held for investment purposes and were improved with multistoried buildings, the management activities required by each were different.

The Pearl Street property was leased primarily for storage purposes. The two tenants, one using the top five floors as a warehouse and the other using the basement and first floor primarily as storage space for the inventory of an inactive fixtures business, required little, if any, services from the petitioner.

On the other hand, the replacement property required numerous services of various kinds on a more or less daily basis. Although there was no need for outside professional management or for a great increase in the number of employees, as in *Clifton Investment*, there was nevertheless a substantial increase in services of a nature required by residential tenants. Petitioner was in an *inactive* managerial position as to the replaced property and in an *active* managerial position as to the replacement property.

Furthermore, the evidence shows that the petitioner has reestablished itself in a substantially better business position, considering the business risks and investment qualities of the two properties. S. E. Ponticos, president of the petitioner for the years involved, testified that plans to remodel the Pearl Street property to make it desirable rental property were discontinued when it was learned that the property was to be condemned for purposes of constructing a highway. Attempts by a real estate broker to find a lessee for the building failed. S. E. Ponticos finally succeeded in leasing the top five floors as a ware-

house for the advertising company located next door and the basement and first floor to his son-in-law, doing business as Axiotes, Inc., to maintain a fixture business. He indicated that the building was not suitable for any other purposes. The proceeds from the sale of the Pearl Street property were reinvested in garden-type apartments located in a desirable suburban residential area of Cincinnati near other apartments owned by the petitioner.

In view of these facts and circumstances, we conclude that the petitioner has reestablished itself in a business position that varies materially from its former position. The original property and the replacement property are therefore held to be not "similar or related in service or use" as required by section 1033(a)(3)(A).

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

MULRONEY, *J.*, dissenting: Since real property which was held by petitioner for investment was condemned and replaced by real property which was held by petitioner for investment, I would hold the two properties were "similar or related in service or use" within the meaning of section 1033(a)(3)(A), I.R.C. 1954. *Capitol Motor Car Co.* v. *Commissioner*, 314 F. 2d 469 (C.A. 6, 1963), reversing a Memorandum Opinion of this Court; *Liant Record, Inc.* v. *Commissioner*, 303 F. 2d 326 (C.A. 2), reversing 36 T.C. 224; *Steuart Brothers* v. *Commissioner*, 261 F. 2d 580 (C.A. 4), reversing 29 T.C. 372; *Loco Realty Co.* v. *Commissioner*, 306 F. 2d 207 (C.A. 8), reversing 35 T.C. 1059; and *Pohn* v. *Commissioner*, 309 F. 2d 427 (C.A. 7), reversing a Memorandum Opinion of this Court.

FORRESTER and FAY, *JJ.*, agree with this dissent.