Mervin A. ZIEGLER, Executor of the Estate of C. D. McCoy, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 8753.

United States District Court
D. Colorado.

March 18, 1966.

A I asked him how long he had had the weapon and he said he had had it in his possession since the time of purchase."

Urban C. Bergbauer, Jr., St. Louis, Mo., for plaintiff.

Lawrence M. Henry, U. S. Atty., Denver, Colo., by Lawrence E. Doxsee, Atty., Dept. of Justice, Washington, D. C., for defendant.

ARRAJ, Chief Judge.

This civil action is for refund of taxes and interest paid by plaintiff for the year 1956.

Decedent McCoy died July 1, 1949. At the time of his death he owned certain improved real estate on West Colorado Boulevard, Colorado Springs, Colorado, from which he received certain income. The plaintiff succeeded to those assets. That property consisted of land and two concrete block stucco buildings, one of which was used as an office for a used car lot by its tenant, and the other was used as a body repair shop by its tenant. In October of 1956 plaintiff sold this property under threat of condemnation to the Colorado State Highway Department for the total sum of $147,-250.00; $130,000.00 of that amount was in payment for the land containing .9818 acres and $17,250.00 was in payment for the two buildings situate thereon.

In 1957 plaintiff acquired an office building at 1605 South Tejon Street, Colorado Springs, Colorado; in February 1957 he acquired a two-story frame building consisting of two apartments located at 214 East Brookside, Colorado Springs, Colorado. These latter properties were acquired as a reinvestment of a major portion of the proceeds from the involuntary sale to the Highway Department; the balance of such proceeds, after deducting the cost of sale was not reinvested and was reported as long-term capital gain on plaintiff's amended 1956 income tax return and the proper tax paid thereon.

In December 1959 the Commissioner of Internal Revenue timely assessed additional income tax against plaintiff in the amount of $20,246.70 and interest of $3,201.47, which amounts were paid by plaintiff. Plaintiff timely filed a claim for refund for the additional tax and interest so assessed and paid, which claim was disallowed in August 1962.

The question for determination by the Court is

Did the plaintiff reinvest in property similar or related in service or use to the property which was condemned or sold under threat of condemnation within the meaning of Section 1033 (a) (3) (A) of the Internal Revenue Code of 1954?

This question must be answered in the affirmative. Both the condemned property and the replacement properties were held solely for income purposes. The

taxpayer did not occupy either and as to all of the properties his status was that of landlord. Compare Steuart Brothers v. Commissioner, 261 F.2d 580 (C.A.4th 1958) with Lynchburg Nat'l Bank v. Commissioner, 208 F.2d 757 (C.A.4th 1953). Plaintiff concedes that the replacement properties are not exact duplications of the condemned property. However, it has long been held that exact duplication is not necessary. Cotton Concentration Company (1926) 4 B.T.A. 121; M. J. Caldbeck Corp. (1937) 36 B.T.A. 452.

■ Defendant contends that the differences in management and service activities between the condemned and replaced properties establish that the properties are not "similar or related". The evidence does disclose that the plaintiff furnished janitor service for hallways and restrooms in the acquired office building and furnished no such services in the condemned property; the evidence also discloses that the plaintiff furnished water and lights for the hallways and restrooms in the office building and did not furnish such service in the condemned property. Plaintiff did collect the rents on *all* of the properties and performed normal maintenance on *all* of them. There were no halls to maintain in the condemned property, consequently janitorial service for such property would not be needed. The total amount spent for such services in the acquired property was approximately $250 per year; that amount is not of much significance. Presumably, the utilities were paid on the East Brookside property because it was originally a single-family dwelling converted into two apartments; therefore, there was but one meter for the whole building. Consequently, it would be difficult to apportion the cost of the utilities between the respective tenants. In Ponticos, Inc. v. Commissioner (C.A.6th 1964) 338 F.2d 477, an industrial warehouse owned by the taxpayer was taken by a city under threat of condemnation and the proceeds invested in a residential apartment building. The only duties of the taxpayer as lessor of its warehouse property were to maintain the exterior of the building and repair damages caused by fire. The replacement property (apartments) were furnished with heat, water and air conditioning and a swimming pool was available to the tenants; the taxpayer also provided janitorial services to empty waste cans, clean hallways, and keep the grounds and clear sidewalks and streets of ice and snow. In holding the properties were similar or related within the meaning of Section 1033(a), the Court reasoned, which is equally applicable here, that

> "We are not willing to hold that a taxpayer who is compelled to sell, under threat of condemnation, a downtown commercial building from which it receives rentals, and invests the proceeds in an apartment house, must lose the benefits of the statute merely because it hires a janitor to render services essential to apartment house maintenance and provides a swimming pool and other attractions customary in a modern apartment house which are not customary in a downtown commercial building." Id. at 479.

■ Next, defendant asserts that the fact that the value of the improvements on each of the new properties greatly exceeds that of the land precludes a determination that these properties are similar or related in service or use. However, the evidence establishes that, with respect to the Brookside properties, the assessed valuation of the land for 1958 was $890.00 and the assessed valuation of the improvements, constructed in 1895, was $1,590.00. Rather than being "several times more valuable than the land" the value of the improvements fails to exceed twice the value of the land. Concerning the South Tejon properties, the fact that the value of the buildings does considerably exceed the value of the land can be explained through a showing that the improvements were constructed as recently as 1955, the evaluation formula of those improvements being 87 per cent of the base reproduction cost. Notwithstanding this disparity of value, accept-

ing the defendant's argument would require the unwarranted conclusion that Congress intended taxpayers to reinvest in properties of equivalent age in order that they might secure the relief provided in Section 1033-(a) (3) (A).

 Defendant heavily relies on the fact that the condemned properties were used as a showroom for automobiles whereas the replacement properties were utilized as residences and offices. This fact, it asserts, indisputably establishes that the replacement properties are not similar or related in service or use to the condemned property.

First, we should re-emphasize that both the condemned and replacement properties were used by the taxpayer as rental properties. The dissimilar uses for which the properties were utilized by the respective tenants arose from the fact that the tenants engaged in dissimilar businesses which naturally resulted in dissimilar needs. The case of Liant Record, Inc. v. Commissioner, 303 F.2d 326 (C.A.2d 1962) is apposite. There the uses of the properties by the tenants were dissimilar in nature. But the taxpayer used both the condemned and replacement properties as investments for the production of rental income. The Court stated

> \* \* \* [W]here the taxpayer is a lessor \* \* \* the nature of the taxpayer-owner's service or use of the property remains similar although that of the end user changes. There is, therefore, a single test to be applied to both users and investors, i. e., a comparison of the services or uses of the original and replacement properties *to the taxpayer-owner*. Id. at 329. (Emphasis in the original.)

The Seventh Circuit has subscribed to this 'taxpayer-owner use' test in Pohn v. Commissioner, 309 F.2d 427 (1962). There, the taxpayer's relationship to both properties was likewise that of lessor. The Court, in holding that the properties were similar and related in service or use, commented at length.

We think the Liant decision of the Second Circuit is most persuasive. Its view is apparently the one Congress adopted in 1958 in its amendment of § 1033(a). It is the "continuity of interest" which is the key factor. Presumably the taxpayers here would have continued their lessor interest in the converted property had it not been interrupted by the condemnation. In view of the involuntary conversion. (sic) Congress intended to aid such taxpayers by permitting them to place themselves in a "similar or related" position to that held when the property was converted and to continue thereby the interest they held when the condemnation took place. At that time the "service or use" to taxpayers was production of rental income. The "service or use" of the replacement property to them is "similar or related." The replacement did not "alter the nature" of their investment. Id. at 430

We too conclude that the *Liant* rationale mirrors the intent of Congress in enacting section 1033(a) and find it fully applicable to the case at bar. Plaintiff is entitled to the relief sought.

The foregoing shall constitute the Court's findings of fact and conclusions of law thereon pursuant to Fed.R.Civ. Proc. 52. The plaintiff shall prepare and submit an appropriate form of judgment to the Court within fifteen days of this date.